## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RAVINDRA GUYYALA, Derivatively on Behalf of Nominal COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> FRANCISCO D'SOUZA, KAREN MCLOUGHLIN, GORDON COBURN, STEVEN SCHWARTZ, ZEIN ABDALLA, VINITA BALI, MAUREEN BREAKIRON-EVANS, ARCHANA DESKUS, JOHN DINEEN, JOHN N. FOX JR., BRIAN HUMPHRIES, LEO S. MACKAY JR., MICHAEL PATSALOS-FOX, JOSEPH M. VELLI, and SANDRA S. WIJNBERG, <br><br> Defendants, <br><br> and <br><br> COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION, <br><br> Nominal Defendant. | Case No. <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Ravindra Guyyala ("Plaintiff"), by and through Plaintiff's

undersigned attorneys, brings this shareholder derivative action for the benefit of

Nominal Defendant Cognizant Technology Solutions Corporation ("Cognizant" or the "Company"), against certain of the Company's officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (as defined below) violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Cognizant and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on Cognizant's website; (c) review of the pleadings and other documents in the securities class action captioned *In re Cognizant Technology Solutions Corporation Securities Litigation*, Case No. 16-cv-06509-WHW-CLW (D.N.J.) (the "Securities Class Action"); and (d) review of other publicly available information concerning Cognizant and the Defendants. Plaintiff believes that through reasonable discovery, substantial additional evidence will exist for the allegations and claims set forth herein.[1]

## I.      SUMMARY OF THE ACTION

---

[1] While Plaintiff's counsel has conducted its own, independent investigation, many of the allegations herein (and, in particular, the allegations that relate to former employees accounts) are contained in an Amended Class Action Complaint for violation of the federal securities laws (the "Securities Complaint") filed against the Company and certain of its officers and directors in the Securities Class Action.

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant Cognizant against certain of the Company's current and former executive officers and directors aiming to rectify Defendants' violations of the Exchange Act, and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings from approximately February 27, 2015 through the present (the "Relevant Period").[2]

2.      The action arises from a series of material misstatements and omissions made by certain members of the Company's senior management that concealed a bribery scheme at the core of the Company's business. As the Company has now acknowledged, and as criminal and civil actions by the Department of Justice (the "DOJ") and the Securities and Exchange Commission (the "SEC") have corroborated, the bribery scheme was perpetrated by Cognizant's "senior management." The members of Cognizant's senior management who perpetrated the scheme include its former President, Defendant Coburn—whom analysts described as "a leading face of [Cognizant] to the investment community"—and the Company's former Chief Legal Officer, Defendant

---

[2] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 27, 2015 through September 29, 2016; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

Schwartz, who was responsible for overseeing Cognizant's compliance with anticorruption laws and signed many of the Company's false and misleading SEC filings during the Relevant Period.

3.     Cognizant provides information technology and business process ("IT") outsourcing. Although headquartered in the United States, the Company's principal operations are based in India and spread throughout several large campuses. This was key to the Company's profitability: Cognizant leveraged the lower labor, tax, and other business costs of its Indian operations in order to provide IT services to its global clients at highly competitive prices.

4.     One of the principal ways Cognizant cut its own costs, and in turn delivered lower cost services to clients, was by locating its Indian campuses in "Special Economic Zones" or "SEZs." Companies operating from within SEZs are guaranteed a number of highly lucrative benefits, including numerous tax exemptions and holidays, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources. In order to develop or operate a facility within an SEZ, however, businesses are required to secure licenses from India's government. Given the extraordinary value that flows to license-holders, SEZ licenses are highly sought-after.

5.     The pressure Cognizant faced to obtain these valuable licenses increased significantly at the start of the Relevant Period, when the Indian central

government indicated it would soon begin to eliminate the availability of tax benefits for new operations. Thus, during the Relevant Period, Cognizant aggressively expanded its SEZ operations, constructing or expanding four of its ten massive "global delivery centers," each housing thousands of employees, in SEZs. In at least one case, Cognizant was able to secure SEZ licensing for its facilities, despite the fact that the same governmental authority had refused to license the Company's direct competitors to operate in the very same zones.

6.     Cognizant profited enormously from the SEZ status of its Indian operations – a fact that the Company touted throughout the Relevant Period. For instance, when Cognizant reported its "strong performance in 2015" to investors, it stated that the tax benefits it derived from its SEZ licenses increased the Company's net income by $201.4 million (more than 14%) and increased diluted EPS by $0.33 per share (more than 12%). Cognizant also assured investors it would continue to grow its investment in SEZ facilities as a central part of its business strategy, stating, by way of example, that "[w]e have constructed and expect to continue to locate most of our newer development facilities in SEZs."

7.     At the same time that Defendants reported strong financial results driven in substantial part by the valuable benefits the Company received from its SEZ licenses, they also reassured investors that Cognizant was not paying bribes to foreign officials in order to obtain the licenses, and was taking concrete steps to

ensure compliance with applicable anticorruption laws. Cognizant's compliance with anticorruption laws, and its maintenance of appropriate controls to ensure continued compliance, was particularly important to investors because the risk of corruption was especially high in India.

8.      Recognizing the significance of anticorruption compliance to investors, Cognizant issued annual "Sustainability Reports" during the Relevant Period, in which it assured investors it had conducted thorough audits of anticorruption compliance and had discovered "***no incidents***" of corruption. Likewise, the Company disseminated to investors "Cognizant's Core Values and Standards of Business Conduct" (the "Code of Conduct") and "Cognizant Technology Solutions FCPA, UK Bribery Act and Anticorruption Policy" (the "Anticorruption Policy"). In both of these public documents, Cognizant assured investors that it did not make improper payments to foreign officials, and that it had implemented a rigorous control system in order to ensure compliance with anticorruption laws, including the Foreign Corrupt Practices Act ("FCPA"). For instance, in the Code of Conduct, Cognizant stated, "***We do not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company.***"[3] Likewise, in filings with the SEC throughout the Relevant Period, Cognizant assured investors

---

[3]  *Cognizant's Core Values and Standards of Business Conduct* 9 (2015) [hereinafter 2015 Code of Conduct].

that the internal controls the Company had implemented to detect such improper payments were "effective."

9.      Buoyed by Defendants' statements touting the financial success of Cognizant's SEZ operations and assurances that its licenses were legitimately obtained, Cognizant's stock price rose during the Relevant Period. Cognizant's stock price increased from $46.50 per share at the start of the Relevant Period to a Relevant Period high of more than $68 per share – an increase of more than 46%.

10.      Unfortunately for investors, Defendants' statements were materially false and misleading. Contrary to its public pronouncements, Cognizant has now admitted that, between 2010 and 2015, it made at least $6 million in "improper payments" to Indian officials in order to obtain the permits for its Indian facilities. Worse yet, Cognizant has further acknowledged that the Company's "senior management," including Defendant Coburn, perpetrated the bribery scheme, including by overriding the Company's internal financial controls to facilitate the corrupt payments. Moreover, the Company has conceded that, in order to disguise the nature and purpose of these improper payments, Cognizant improperly booked them as legitimate capital expenditures (i.e., investments in physical assets) in the Company's publicly reported financial statements – accounting chicanery that overstated the Company's investments in its SEZ facilities and its net income.

11.     Notably, the Securities Class Action has revealed that the Company's internal auditors reported evidence of these improper payments to Cognizant's senior managers during the Relevant Period. A former Cognizant audit executive reported that in the fall of 2014, Cognizant conducted its first FCPA compliance audit in at least two years. As detailed herein, that audit uncovered evidence that payments related to procuring SEZ licensing were being made to government personnel and that these payments were being improperly classified in Cognizant's internal systems. These troubling findings were reported during the Relevant Period to senior Cognizant audit and compliance executives.

12.     Cognizant's scheme to secure SEZ licenses through corrupt payments to Indian officials, and the intimate involvement of senior Company management in that scheme, was concealed from investors until September 30, 2016. On that day, Cognizant shocked investors by announcing that its Board of Directors ("Board") was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws." Cognizant also announced that Coburn – the Company's President, who had held numerous senior executive positions during his seventeen-year career at Cognizant – had suddenly resigned amidst the corruption investigation.

13.     Analysts and investors were stunned by Cognizant's September 30, 2016 disclosures. For example, Argus analysts downgraded Cognizant, characterizing the "announced resignation of the company's president amid a corruption investigation in India" as "blockbuster news." These analysts observed that "given that a top executive has resigned . . . we see risks that the illegal practices could be extensive and long-lived." Id. In response to these disclosures, Cognizant's stock price swiftly declined. The Company's stock price fell more than 13%, or $7.29 per share, from $55.00 to $47.71 on the year's highest trading volume by far (over 53 million shares). This one-day decline, by itself, eradicated $4.4 billion in shareholder value.

14.     Since September 30, 2016, Cognizant has admitted that multiple members of its senior management were deeply involved in the bribery scheme, and, thus, a number of its statements to investors during the Relevant Period were false and misleading. On November 7, 2016, Cognizant admitted that "certain members of *senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company* relating to real estate and procurement principally in connection with permits for certain facilities in India." Further confirming that Defendant Coburn was involved in the scheme, Cognizant also admitted that the senior executives involved in the improper

payments were "no longer with the company or in the senior management position." In light of this misconduct, Cognizant also admitted that, contrary to its representations: (i) the Company's internal controls were materially deficient during the Relevant Period; and (ii) it improperly accounted for the corrupt payments in its public financial reports by recording them as investments in physical assets. Likewise, Cognizant has acknowledged that its representation in its publicly filed credit agreement that the Company was compliant with anticorruption laws – a statement that parallels those made in the Sustainability Reports, Anticorruption Policy, and Code of Conduct – was "materially incorrect."

15.    The misconduct at issue in this case continues to have a significant negative impact on Cognizant. By the end of 2016, the Company had "incurred $27 million in costs related to" the investigation of the wrongdoing alleged herein "and related lawsuits." Moreover, the Company's investigation is ongoing. This misconduct also has triggered significant government scrutiny, as both the SEC and the U.S. Department of Justice ("DOJ") have investigated the improper payments to Indian officials at the core of this case.

16.    The DOJ and SEC investigations confirm that Cognizant's most senior executives directly participated in a criminal bribery scheme to obtain essential permits for critical SEZ facilities, and that these executives falsified

Cognizant's SEC filings and Sustainability Reports in order to facilitate that scheme.

17.     On February 14, 2019, the Department of Justice issued an indictment – returned by a federal grand jury sitting in Newark, New Jersey – of Defendant Coburn, Cognizant's former President, and Defendant Schwartz, Cognizant's former Chief Legal Officer, on 12 criminal counts arising from the bribery scheme and false statements at the heart of this case. *See* Indictment, *United States v. Gordon J. Coburn and Steven Schwartz*, Crim. No. 19-120 KM (D.N.J.) (the "Indictment"). The Indictment also identifies other high-ranking Cognizant employees as coconspirators in the fraudulent scheme, including Cognizant's former Chief Operating Officer, who on information and belief was Sridhar Thiruvengadam ("Thiruvengadam"), as well as Cognizant's former Vice President of Administration.

18.     The same day that the Indictment was made public, February 15, 2019, the SEC filed a civil action against Coburn and Schwartz alleging violations of the FCPA and securities laws arising from the same bribery scheme detailed in the Indictment and alleged herein. *See SEC v. Gordon J. Coburn and Steven E. Schwartz*, No. 2:19-cv-05820 (D.N.J.) (the "SEC Action").

19.     Separately, the SEC also announced that day that Cognizant had settled claims that it violated the securities laws in connection with ***several***

different bribes paid as part of the Company's ongoing scheme to obtain licensing for its all-important SEZ facilities. Cognizant agreed to pay $25 million and undertake a rigorous remediation program that requires the Company to provide the SEC with written compliance reports for the next two years and submit to periodic reviews by the agency. *See In re Cognizant Tech. Solutions Corp.*, Exchange Act Release No. 85149 (the "SEC Order").

20.    The Indictment, SEC Action, and SEC Order are the result of a two-year investigation by the DOJ and SEC, and are based on Cognizant's own internal documents and the accounts of multiple unindicted co-conspirators, including multiple former senior Cognizant executives who participated in the scheme. Indeed, in a February 13, 2019 letter to Cognizant, the DOJ noted that Cognizant provided it with "all known relevant facts about the misconduct." Based on this evidence, the Indictment, the SEC Action, and the SEC Order describe a significant bribery scheme to secure critical permits for the Company's SEZ campuses in Chennai, Pune, and Siruseri—including permits that were necessary for the construction and operation of the Company's largest SEZ facility, located at 1 SEZ Avenue in Chennai: the Knowledge Industry Township Campus (the "KITS Campus").

21.    As detailed further herein, the Indictment, the SEC Action, and the SEC Order provide new facts evincing that Defendants Coburn and Schwartz

orchestrated and approved Cognizant's illicit bribery scheme. Among other things, Coburn and Schwartz: (1) instructed Cognizant employees to funnel over $2 million in bribes to an Indian government official through a third-party contractor in order to obtain essential SEZ permitting; (2) instructed Cognizant employees to withhold monies owed to the contractor in order to force it to participate in Cognizant's illegal bribery scheme; (3) to further induce the contractor to deliver the bribe, authorized the payment of an additional $500,000 to the contractor; (4) devised a scheme to use phony invoices to disguise the bribes as payment to the contractor for supposedly legitimate cost overruns; and (5) hatched this scheme during multiple international video conference calls, and pointedly instructed their co-conspirators to avoid using email in order to avoid detection.

22.     Defendants Coburn and Schwartz also made, and directly participated in making, false statements concealing this scheme from investors. Specifically, Coburn and Schwartz intentionally falsified Cognizant's books and records by ordering the creation of fraudulent invoices to hide the bribe payments, which they knew would cause the Company to falsely report the bribes as *bona fide* capital expenditures in its public financial statements. Moreover, Coburn and Schwartz were responsible for approving the false financial filings disseminated to investors, and took a number of steps to ensure that this false financial information was indeed publicly reported. Among other things, Coburn and Schwartz signed

required sub-certifications to these financial statements and provided the Company's auditors with "management representation letters," in which they falsely stated that they had no knowledge of any fraud involving senior management. Cognizant could not have filed its false and misleading financial reports with the SEC had Coburn and Schwartz not executed and delivered their false letters and certifications. Significantly, as Cognizant's Chief Legal Officer, Schwartz also personally signed the Company's Forms 8-K that were filed with the SEC—which attached Cognizant's false earnings releases—and thus publicly disclosed the false and misleading financial information to investors.

23.    Coburn and Schwartz also participated in approving and issuing Cognizant's Sustainability Reports issued during the Relevant Period, which falsely stated that there had been "no incidents" of corruption at the Company. Among other things, Defendants Coburn and Schwartz intentionally furnished false information that was incorporated into these statements—including certifying their personal compliance with the Company's anticorruption policy and maintenance of accurate books and records—none of which were true.

24.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

25.    In accordance with applicable law, on March 27, 2019, Plaintiff made a written demand on Cognizant's Board to investigate and, if warranted, take necessary legal action against those responsible for the damages the Company has suffered in connection with the events underlying the Securities Class Action (the "Demand").[4]

26.    As discussed in detail below, the Boards refusal of the Demand was wrongful and unreasonable under Delaware law. In light of the Board's unreasonable and wrongful refusal of Plaintiff's demand to investigate and remediate harms caused to the Company, Plaintiff filed this shareholder derivative action.

27.    Here, the Board has failed in its duty concerning Plaintiff's pre-suit demand.  Whether the Board failed to meet its own self-imposed deadlines, failed to investigate or even address the accuracy of the Company's public disclosures, failed to engage in a meaningful and transparent process, reached inexplicable conclusions, or failed to undertake any investigation whatsoever of the actual demands made, it is clear that its response to the Demand was improper and directly at odds with the Board's fiduciary duties. Accordingly, this derivative action should proceed.

---

[4] The initial demand was pursued by Mahalingam Sudarsan ("Sudarsan"), a shareholder of Cognizant.  Sudarsan will no longer pursue the Demand, which will instead by pursued by Plaintiff in this Action.

## II.    JURISDICTION AND VENUE

28.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

29.    This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

30.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein occurred in this District. Further, Cognizant is incorporated in this District.

## III.   THE PARTIES

### A.    Plaintiff

31.    Plaintiff has continuously been a shareholder throughout the period of the wrongdoings complained of herein, and is a current shareholder.

### B.    Nominal Defendant

32.    Nominal Defendant Cognizant is a Delaware corporation with its principal executive offices located at Glenpointe Centre West, 500 Frank W. Burr Blvd., Teaneck, New Jersey 07666.  Cognizant's shares trade on the NASDAQ Stock Market under the ticker symbol "CTSH."

**C.    Defendants**

33.    Defendant Francisco D'Souza ("D'Souza") became Cognizant's CEO in 2007 and served as CEO throughout the Relevant Period until his departure in 2019. D'Souza joined Cognizant as a co-founder in 1994, the year it was started as a division of The Dun & Bradstreet Corporation. D'Souza also served as Cognizant's President from 2007 to 2012 and Chief Operating Officer from 2003 to 2006. Cognizant paid defendant D'Souza the following compensation as an executive

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $29,234,344 |
| 2018 | $14,094,531 |
| 2017 | $12,478,392 |
| 2016 | $12,030,863 |
| 2015 | $11,951,383 |

34.    Defendant Karen McLoughlin ("McLoughlin") became Cognizant's CFO in 2012 and served as CFO throughout the Relevant Period. McLoughlin

oversees the Company's worldwide Financial Planning & Analysis, Accounting & Controllership, Tax, Investor Relations, Treasury, Internal Audit and Enterprise Risk Management functions. McLoughlin also served as Senior Vice-President, Enterprise Transformation and Financial Planning & Analysis from 2010 to 2012, and was responsible for the Company's worldwide financial planning and analysis, enterprise risk management and enterprise transformation functions. Cognizant paid Defendant McLoughlin the following compensation as an executive:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $5,380,670 |
| 2018 | $5,523,155 |
| 2017 | $4,001,045 |
| 2016 | $3,637,530 |
| 2015 | $3,705,728 |

35.     Defendant Gordon Coburn ("Coburn") served as Cognizant's President from February 6, 2012, until his abrupt resignation on September 27, 2016, which was publicly disclosed by the Company on September 30, 2016. During the Relevant Period, Coburn was Cognizant's second-highest paid executive, earning $7 million in 2015 alone. As noted in Cognizant's February 8, 2012 press release announcing Coburn's promotion to President, Coburn was responsible for managing "Cognizant's overall P&L"—*i.e.*, its overall profit and

loss statements. Coburn also served as the Chief Financial and Operating Officer of Cognizant from January 1, 2007 to February 6, 2012. As Chief Financial Officer, Coburn personally signed numerous correspondence on behalf of Cognizant responding to SEC staff comments on Cognizant's filings, at the end of each of which he explicitly directed SEC staff to contact him or Defendant Schwartz with any further questions. Coburn also served as the Company's Executive Vice President from December 2003 through December 2006. From November 1999 to December 2003, he served as the Company's Senior Vice President. Cognizant paid Defendant Coburn the following compensation as an executive:

| YEAR | TOTAL COMPENSATION |
| --- | --- |
| 2016 | $4,494,983 |
| 2015 | $7,045,160 |

36.    Defendant Steven Schwartz ("Schwartz") served as the Company's Executive Vice President, Chief Legal and Corporate Affairs Officer from December 2013 through November 2016. In that role, Schwartz was responsible for managing Cognizant's global legal teams, global government affairs efforts, and global security team. Schwartz also was responsible for overseeing and managing Cognizant's compliance functions, which reported to Schwartz. Schwartz also served as Cognizant's Senior Vice President, General Counsel and Secretary, from July 2007 to December 2013, in which capacity he had global

responsibility for managing Cognizant's legal function and served as the Company's Chief Legal Officer. During that time, in correspondence responding to SEC staff comments on Cognizant's financial filings, Defendant Coburn explicitly instructed SEC staff to contact either himself or Schwartz with any questions. Schwartz also served as the Company's Vice President and General Counsel from March 2003 to July 2007; Vice President and Chief Corporate Counsel from April 2002 to March 2003; and prior to that time as Chief Corporate Counsel since joining the Company in October 2001.

37.     Zein Abdalla ("Abdalla") has been a member of Cognizant's Board since September 2015. Cognizant paid Defendant Abdalla the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $335,940 |
| 2018 | $326,963 |
| 2017 | $317,987 |
| 2016 | $323,947 |
| 2015 | $180,423 |

38.     Vinita Bali ("Bali") has been a member of Cognizant's Board since February 2020.

39.     Maureen Breakiron-Evans ("Breakiron-Evans") has been a member of Cognizant's Board since May 2009. Cognizant paid Defendant Breakiron-Evans the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $347,440 |
| 2018 | $344,484 |
| 2017 | $342,987 |
| 2016 | $350,447 |
| 2015 | $314,804 |

40.     Archana Deskus ("Deskus") has been a member of Cognizant's Board since March 2020.

41.     John Dineen ("Dineen") has been a member of Cognizant's Board since April 2017. Cognizant paid Defendant Dineen the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $328,440 |
| 2018 | $324,416 |
| 2017 | $370,651 |

42.     John N. Fox Jr. ("Fox Jr.") has been a member of Cognizant's Board since December 2007. Cognizant paid Defendant Fox Jr. the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $334,440 |
| 2018 | $331,484 |
| 2017 | $328,487 |
| 2016 | $313,447 |
| 2015 | $287,996 |

43.     Brian Humphries ("Humphries") has been the Company's CEO and a member of Cognizant's Board since April 2019. Cognizant paid Defendant Humphries the following compensation as the Company's CEO and a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $15,958,002 |

44.     Leo S. Mackay Jr. ("Mackay") has been a member of Cognizant's Board since September 2012. Cognizant paid Defendant Mackay the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|

| 2019 | $329,940 |
| 2018 | $311,984 |
| 2017 | $310,487 |
| 2016 | $316,447 |
| 2015 | $289,496 |

45.     Michael Patsalos-Fox ("Patsalos-Fox") has been a member of Cognizant's Board since July 2012 and has served as the Chairman of the Board since September 2018. Cognizant paid Defendant Patsalos-Fox the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
| --- | --- |
| 2019 | $476,940 |
| 2018 | $443,100 |
| 2017 | $332,987 |
| 2016 | $313,447 |
| 2015 | $287,996 |

46.     Joseph M. Velli ("Velli") has been a member of Cognizant's Board since December 2017. Cognizant paid Defendant Velli the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $322,440 |
| 2018 | $311,984 |
| 2017 | $144,642 |

47.    Sandra S. Wijnberg ("Wijnberg") has been a member of Cognizant's Board since July 2019. Cognizant paid Defendant Wijnberg the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $270,859 |

48.    Defendants D'Souza, McLoughlin, Coburn, and Schwartz are referred to herein as the "Executive Defendants."

49.    Defendants Abdalla, Bali, Breakiron-Evans, Deskus, Dineen, Fox Jr., Humphries, Mackay, Patsalos-Fox, Velli, and Wijnberg are referred to herein as the "Director Defendants."

50.    The Director Defendants, along with the Executive Defendants, are collectively referred to herein as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

51.     By reason of their positions as officers, directors, and/or fiduciaries of Cognizant, and because of their ability to control the business and corporate affairs of Cognizant, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Cognizant in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Cognizant and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

52.     Each director and officer of the Company owes to Cognizant and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

53.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

## **Control, Access, and Authority**

54.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cognizant, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Cognizant.

55.    Because of their advisory, executive, managerial, and directorial positions with Cognizant, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Cognizant.

56.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cognizant, and was at all times acting within the course and scope of such agency.

**<u>Reasonable and Prudent Supervision</u>**

57.    To discharge their duties, the officers and directors of Cognizant were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Cognizant were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority

and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Cognizant conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Cognizant was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.   BREACHES OF DUTIES

58.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Cognizant and its shareholders the fiduciary duties of

loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Cognizant, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cognizant, the absence of good faith on their part, and a reckless disregard for their duties to Cognizant and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Cognizant.

59.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

60.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws. As a result, Cognizant has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct,

and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

63.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law; and (b) disguise and misrepresent the Company's actual business and financial prospects.

64.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.     Cognizant's Success as an Outsourcing Business Was Driven by Its Use of Indian "Special Economic Zones" to Lower the Company's Taxes and Costs

66.     Cognizant is a leading provider of IT outsourcing services, with its principal operations in India. Cognizant began as an Indian company headquartered in Chennai. While the Company later moved its headquarters to the United States, the bulk of Cognizant's operations remained in India. During the Relevant Period, more than 150,000 of Cognizant's approximately 200,000 employees, nearly 75% of the Company's workforce, were located in India. The Company housed its Indian employees on ten campuses in cities across India, including in Chennai, Coimbatore, Kolkata, and Hyderabad.

67.     As with many other India-centric IT outsourcing companies, Cognizant's success was driven in significant part by its "global delivery model," which leveraged the lower labor, tax, and other business costs of its Indian

operations to provide IT development and maintenance for international clients at highly competitive prices. Throughout the Relevant Period, Cognizant and its senior executives repeatedly told investors that the Company's business strategy revolved around a "dual mandate": helping clients achieve operational efficiency by reducing their IT costs and redeploying those savings into new digital technologies. As McLoughlin told investors at an August 12, 2015 investor conference, "[W]e're seeing clients continue to look for partners who can execute on this dual mandate. So help me drive down my costs of my current operations . . . . and take those dollars and really deploy them into meaningful digital transformation. . . . [We] think that will continue to be a driver of growth as we move forward."[5]

68.     Defendants repeatedly cited Cognizant's success in delivering cost savings to clients as key to its execution of this dual mandate. For example, at a September 6, 2016 investor conference, D'Souza stated, "we've been very successful at, while maintaining our margins, being able to achieve the cost of ownership that the clients want."[6] Accordingly, providing clients with global IT cost arbitrage opportunities was a foundational element of Cognizant's business model. And, on its website, Cognizant told investors that its presence in India, in

---

[5] Tr. of Oppenheimer Tech., Internet & Commc'ns Conf. at 1 (Aug. 12, 2015).
[6] Tr. of Citi Global Tech. Conf. at 9 (Bloomberg Sept. 6, 2016).

particular, was "a crucial piece of [that] global business strategy"[7] because of the cost savings that centralizing operations in India produced.

      69.    To cut its costs and, in turn, provide IT services at lower costs to clients, Cognizant constructed and operated its Indian facilities in designated SEZs. Licenses to develop and/or operate within SEZs are awarded by Indian central and regional governments. Companies who receive these licenses are guaranteed a plethora of lucrative benefits, including numerous tax exemptions and holidays, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources. According to a publication issued by India's Department of Commerce, incentives for businesses operating within an SEZ include:

- Duty free import/domestic procurement of goods for development, operation and maintenance of SEZ units.

- 100% Income Tax exemption on export income . . . for first 5 years, 50% for next 5 years thereafter and 50% of the ploughed back export profit for next 5 years.

- Exemption from minimum alternate tax . . . .

- External commercial borrowing by SEZ units up to US $500 million in a year without any maturity restriction through recognized banking channels.

- Exemption from Central Sales Tax.

- Exemption from Service Tax.

[7] *About Cognizant - India*, Cognizant, https://www.cognizant.com/india.

- Single window clearance for Central and State level approvals [i.e., a centralized approval process for obtaining regulatory approval, greatly reducing transaction costs].
- Exemption from State sales tax and other levies as extended by the respective State Governments.[8]

Moreover, businesses operating within SEZs are entitled to "self-certify" compliance with applicable regulatory regimes, including labor and customs laws and regulations, and have access to expedited dispute resolution mechanisms. Again, these benefits work to reduce greatly the transaction costs for firms operating in SEZs. Additional tax benefits are extended to companies that develop SEZs, including exemption from custom/excise duties and dividend distribution tax.

70.    Cognizant built and operated in India at least ten "global delivery centers" (large IT campuses that housed thousands of employees) and aggressively pursued SEZ licensing for those facilities. Notably, Cognizant constructed or expanded at least four of its ten SEZ-licensed Indian global delivery centers during the Relevant Period: those located in Kolkata, Coimbatore, Hyderabad, and the Company's Indian headquarters in Chennai.

71.    Building and expanding SEZ-licensed facilities was key to the Company's performance in multiple ways. First, building and expanding SEZ

---

[8] Department of Commerce, Government of India, *Special Economic Zones in India*, http://www.sezindia.nic.in/about-fi.asp.

facilities increased Cognizant's ability to drive revenue: the more employees the Company could put to work at its SEZ facilities, the more revenue it would book. Accordingly, analysts repeatedly focused on the Company's headcount and "utilization rates," i.e., the extent to which employees' time was being billed to client projects. For instance, in a July 25, 2016 report, Deutsche Bank analysts stated, "the company continues to focus on retention efforts and we believe headcount remains an important leading indicator and expect headcount growth to accelerate ahead of revenue acceleration."[9]

72.    Second, as noted above, the SEZ status of Cognizant's Indian operations allowed the Company to reduce massively its tax and operating costs, which also was critical to its financial performance. Indeed, as noted previously and detailed further below, in reports filed with the SEC throughout the Relevant Period, Cognizant reported that the tax benefits, alone, that it derived from its SEZ licenses increased the Company's net income by hundreds of millions of dollars. Cognizant acknowledged that these benefits materially impacted the Company's financial condition, and that "[c]hanges in Indian tax laws" that "would reduce or

---

[9] Bryan Keane, Research Analyst et al., *Guidance Revision Coming?* 6 (Deutsche Bank AG July 25, 2016).

deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition."[10]

73.    Third, the enormous tax and operating cost savings Cognizant generated through the SEZ status of its Indian operations also gave Cognizant a significant competitive advantage among its outsourcing peers, and were therefore instrumental in helping the Company garner new business through the delivery of lower cost IT services to its US and European clients. As discussed above, Defendants emphasized that clients' interest in cutting IT costs was a primary driver of demand for Cognizant's services. During the Company's August 5, 2016 earnings call, Coburn told investors that cost-cutting "remains absolutely essential to almost every client"[11] of the Company, and Cognizant's SEC filings listed "competitive pricing of services" as among the "principal competitive factors affecting the markets for our services."[12]

B.    **Planned Changes to Indian Tax Law Put Increased Pressure on Cognizant to Obtain SEZ Licensing for Its Facilities As Quickly As Possible During the Relevant Period**

---

[10] *See, e.g.,* Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 27 (Feb. 25, 2016).

[11] Tr. of Q2 2016 Earnings Call at 4 (Bloomberg Aug. 5, 2016).

[12] *See, e.g.,* Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 12 (Feb. 27, 2015) [hereinafter 2014 Form 10-K].

74.   During the Relevant Period, looming changes to Indian tax law that would phase out tax benefits for SEZs established after April 2017 put increased pressure on Cognizant to obtain valuable SEZ licensing for its Indian operations as quickly as possible. In February 2015, India's Finance Minister, Arun Jaitley, sent signals that the government could move to limit tax benefits for newly constructed SEZs. In a speech on February 28, 2015, Minister Jaitley made sweeping criticisms of India's "regime of [corporate tax] exemptions," which he said "led to pressure groups, litigation, and loss of revenue."[13] Minister Jaitley expressed a keen interest in lowering India's general corporate tax rate, which he characterized as higher than the rate "prevalent in other major Asian economies," and eliminating "various kinds of tax exemptions and incentives for corporate tax payers" to pay for the tax cut.[14]

75.   In November 2015, India's Central Board for Direct Taxes ("Central Board") put even greater pressure on Cognizant to move as expeditiously as possible to obtain valuable SEZ permitting for new operations when it, consistent with Minister Jaitley's February 2015 speech, issued a draft proposal phasing out SEZ tax benefits for the development of new facilities commencing activities after

---

[13] Puja Mehra, *Changes in Corporate Tax Regime to Reduce disputes: Jaitley*, Hindu (Mar. 2, 2015, 00:28 IST), http://www.thehindu.com/news/national/changes-in-corporate-tax-regime-oreduce-disputes-jaitley/article6948860.ece?utm_source=RSS_Feed&utm_medium=RSS&utm_campaign=RSS_Syndication.

[14] *Id.*

April 1, 2017. A few months later, in February 2016, Minister Jaitley, on behalf of the Ministry of Finance, presented a final budget plan implementing a policy for phasing out SEZ tax exemptions after April 1, 2020, consistent with the Central Board's proposal and the Minister's speech the prior year.[15]

76.     Given the enormous pressure it faced to obtain SEZ licensing prior to the phasing out of tax benefits for new operations, Cognizant embarked on an SEZ development spree during the Relevant Period. As discussed above, Cognizant built or expanded at least four of its ten SEZ licensed Indian global delivery centers during the Relevant Period. In early September 2015, Cognizant signed agreements with the Tamil Nadu state government to expand its major global delivery center in Coimbatore and its Indian headquarters in Chennai. As reported by *India Today* on September 10, 2015, Cognizant's vice chairman and former CEO, Lakshmi Narayan, highlighted the ambitious scope of the planned campus expansions, stating, "[w]hen complete, the centres will have a capacity to accommodate approximately 17,000 to 20,000 professionals."[16]

77.     Shortly thereafter, in March 2016, Cognizant received approval from the Telangana state government to construct a massive SEZ facility in the state's

---

[15] Shrimi Choudhary, *Corp Tax Cut Takes Last Budget Forward*, Daily News & Analysis (Mar. 1, 2016).

[16] *Cognizant to Invest Rs 1,000 cr in TN in Next 5 Yrs*, India Today (Sept. 10, 2015, 21:25 IST), http://indiatoday.intoday.in/story/cognizant-to-invest-rs-1000-cr-in-tn-in-next-5-yrs/1/470681.html.

capital, Hyderabad, that would house 8,500 employees. Just a few months later, in August 2016, Cognizant received approval to construct an SEZ facility in Kolkata, West Bengal, occupying a sprawling fifteen-acre plot. *The Telegraph* (of India) reported on August 3, 2016, that the development was expected to house 10,000 Cognizant employees.[17] As part of the deal, government officials waived its development fee.[18] Moreover, sources reported that the state government's Housing Infrastructure Development Corporation, which sold the land to Cognizant, had ensured that the price of the land "would be 'kept reasonable' to sweeten the deal."[19]

78.    Notably, while Cognizant received SEZ licensing for its Kolkata facilities, the state government had refused to grant licenses to the Company's competitors, including Wipro Limited and Infosys Limited. Both Wipro and Infosys had purchased fifty acres of land apiece in the region based on the previous state administration's assurances that their projects would receive SEZ status – a promise the new state government had declined to honor. In an August 5, 2016 article, the *Times of India* reported that, in the wake of the government's grant of

---

[17] *Mamata Government Allots New Town Plot for Company's Third Campus in Calcutta*, Telegraph (India) (Aug. 3, 2016), https://www.telegraphindia.com/1160803/jsp/calcutta/story_100288.jsp.

[18] *Id.*

[19] *Id.*

SEZ licensing to Cognizant, several other IT outsourcing companies called on the state's IT Minister, Bratya Basu, "to evince interest in contributing more to the state's technological ecosystem."[20] While Minister Basu met with several business leaders, his meeting with Cognizant's Senior Vice President of Infrastructure Service, Nachiket Deshpande, reportedly took "significantly more time than the other chat sessions."[21]

### C. Defendants Underscored the Benefits of Cognizant's SEZ Licenses As a Key Driver of Its Financial Performance, While Assuring Investors that Cognizant Did Not Make Improper Payments to Foreign Officials

79.     As detailed below, throughout the Relevant Period, Defendants repeatedly emphasized that the Company's SEZ facilities were a critical driver of its strong financial performance. At the same time, Defendants also assured the investing public that they had legitimately obtained the SEZ licenses, stating that Cognizant did not make any payments to government officials to obtain anything of value, and that the Company maintained a system of rigorous internal controls precisely to prevent such payments. As investors would ultimately learn, these statements were materially false and misleading.

---

[20] *Tech Bosses Meet Kolkata's IT Minister Bratya Basu*, Times of India (Aug. 5, 2016, 8:39 AM IST); http://timesofindia.indiatimes.com/city/kolkata/Tech-bosses-meet-Kolkatas-IT-minister-Bratya-Basu/articleshow/53551377.cms.

[21] *Id.*

### 1. Defendants Highlighted that Cognizant's SEZ Operations Were a Crucial Driver of Its "Strong" Financial Performance

80.   During the Relevant Period, Defendants consistently reported what they described as "strong" financial results, even when the IT outsourcing industry was facing headwinds. When reporting these results, Defendants repeatedly highlighted the benefits the Company received from the SEZ status of its Indian operations during the Relevant Period. For instance, in its 2014 Annual Report, Cognizant reported that 2014 saw "strong growth on the top line," and explained that its financial results were driven in significant part by its SEZ facilities, stating that "the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately [$183 million] . . . and increase diluted EPS by $0.30."[22] In reporting on its "strong performance" in its 2015 Annual Report, Cognizant again emphasized that its results were driven significantly by its Indian SEZ operations, reporting that these facilities had "increase[d] net income by approximately $201.4 million . . . and increase[d] diluted EPS by $0.33," a material increase over the prior year.[23]

---

[22] Cognizant, *2014 Annual Report*, at 3, 126.

[23] Cognizant, *2015 Annual Report*, at 4, 92.

81.     Defendants also highlighted to investors that expanding Cognizant's SEZ facilities was a key part of its business strategy. For instance, in the Company's SEC filings, Defendants repeatedly stated that "[w]e pursue an international strategy that includes expanded infrastructure investments in India," "[w]e have constructed and expect to continue to operate most of our newer development facilities in SEZs," and Cognizant would continue to "[l]ocate most of our new development center facilities in tax incentivized areas" in response to the most significant trends and risks it was seeing in its business.[24] Defendants also assured investors that Cognizant was continuing to pursue this strategy by making significant capital expenditures to grow and expand its SEZ operations. For instance, in its second quarter 2016 Form 10-Q, Cognizant stated that, "[a]s of June 30, 2016, we had outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."[25]

82.     In addition to emphasizing the positive financial impact of the Company's SEZ operations, Defendants also made statements attributing Cognizant's financial success to a number of other ostensibly legitimate business factors and conditions. For example, in its SEC filings, Cognizant repeatedly set

[24] *Id.* at 92, 58, 47.

[25] Cognizant Tech. Sols. Corp., Quarterly Report (Form 10-Q), at 19 (Aug. 5, 2016).

forth the "key drivers of our revenue growth," which included numerous legitimate factors such as "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and BPS services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of the market for global delivery of IT services and BPS."

83.     At the same time that Defendants were reporting strong financial results driven by Cognizant's SEZ strategy, they were reassuring investors that Cognizant was not bribing foreign officials, and that the Company was taking concrete steps to ensure compliance with anticorruption laws. As discussed below, these statements were material to investors.

### 2.     Defendants Assured Investors That Cognizant Did Not Make Improper Payments to Foreign Officials, and Maintained a System of Internal Controls to Prevent Such Payments

84.     The FCPA prohibits both direct and indirect payments to "any officer or employee of a foreign government," including employees of state-owned enterprises, in order to influence their official "act[s] or decision[s]" or to "secur[e]

any improper advantage."[26] Companies can, and often do, face FCPA liability based on improper payments made by their agents or other business partners.

85.    The penalties, including criminal penalties, that may be imposed for violations of the FCPA's anti-bribery provisions are severe.[27] Corporate violators, in particular, may face multimillion dollar fines and disgorgement of up to twice the benefit obtained through the corrupt payment. The Attorney General or the SEC may bring civil actions seeking fines against both corporate and individual violators.

86.    In recent years, both the DOJ and the SEC have significantly increased enforcement of the FCPA.[28] In 2010, the SEC's Enforcement Division created a specialized unit to further enhance its enforcement of the FCPA.[29] That same year, the DOJ brought forty-eight enforcement actions and the SEC brought

---

[26] 15 U.S.C. § 78dd-1.

[27] *See, e.g., Clayco Petrol. Corp. v. Occidental Petrol. Corp.,* 712 F.2d 404, 408 (9th Cir. 1983).

("The Act provides for severe criminal penalties including fines and imprisonment." (citing 15 U.S.C. §§ 78dd-2(b), 78ff)).

[28] Cortney Thomas, *The Foreign Corrupt Practices Act: A Decade of Rapid Expansion Explained, Defended, and Justified*, 29 Rev. Litig. 439, 439-40 (Winter 2010) (noting "exponential increase" in FCPA enforcement by DOJ and SEC beginning in early 21st century).

[29] Press Release, U.S. SEC, SEC Names New Specialized Unit Chiefs and Head of New Office of Market Intelligence (Jan. 13, 2010), https://www.sec.gov/news/press/2010/2010-5.htm.

twenty-six.[30] Furthermore, the DOJ and the SEC "have worked to create a network of international cooperation in the global war against bribery and corruption."[31] As commentators remarked: "With the recent burst of enforcement activity and the sharp increase in fines and penalties collected, everyone doing business abroad must now pay particular attention to the FCPA."[32] Gibson Dunn's "2016 Year-End FCPA Update" noted that:

> 2016 was a precedent-setting year for the Foreign Corrupt Practices Act ("FCPA"). After several years of consistent enforcement numbers, the Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") produced what arguably is the most significant year of enforcement in the statute's 39-year history. With 53 combined enforcement actions, more than $2 billion in corporate fines levied by U.S. enforcers and billions more by foreign regulators in coordinated prosecutions, early returns on the DOJ's FCPA Pilot Program, and an increasingly clear intersection between the FCPA and Dodd-Frank's whistleblower provisions, there is much to discuss.[33]

---

[30] Covington & Burling LLP, Significant Developments and Trends in Anti-Corruption Enforcement 1 (Jan. 2011), http://www.cov.com/files/Publication/5ff 26ab9-61cf-46f4-ba8aaa463a65f9fe/Presentation/PublicationAttachment/437b6d49 -f6c1-4b3a-b2adbe89b9337322/Significant%20Developments%20and%20Trends %20in%20AntiCorruption%20Enforcement.pdf.

[31] Tom Fox, *Global Anti-corruption Enforcement Numbers Going Up, Compliance Week* (Feb. 14, 2017), https://www.complianceweek.com/blogs/tom-fox-tom-fox/global-anti-corruptionenforcement-numbers-going-up#.WMf5Xm_yvcs.

[32] Robert C. Blume & Ryan V. Caughey, Commentary, The FCPA: *Overview, Enforcement Trends and Best Practices*, 13 Andrews Sec. Litig. & Reg. Reporter 1, 1 (Nov. 3, 2009).

[33] Gibson, Dunn & Crutcher LLP, *2016 Year-End FCPA Update* 1 (Jan. 3, 2017),

87.     Because Cognizant's operations are principally located outside of the United States, the Company's compliance with anticorruption laws, and its maintenance of appropriate controls to ensure continued compliance, was critical to investors. This was particularly true of Cognizant's Indian business, not only because it comprised the vast majority of the Company's operations and was crucial to Cognizant's success, but because, as Forbes reported on February 11, 2016, corruption watchdogs ranked India as one of the world's most corrupt countries during the Relevant Period.[34]

88.     Indeed, U.S. companies' Indian operations have become an increasingly prominent target of federal regulators' FCPA enforcement programs. As commentators have explained, over the past decade "both the DOJ and the SEC have targeted misconduct in India across a wide range of industries from manufacturing and construction to oil and information technology."[35]

---

http://www.gibsondunn.com/publications/documents/2016-Year-End-FCPA-Update.pdf.

[34] Ronak D. Desai, *India Remains One of the Most Corrupt countries in the World*, Forbes (Feb. 11, 2016 4:11 PM), https//www.forbes.com/sites/ronakdesai/2016/02/11/india-remains-one-ofthe-most-corrupt-countries-in-the-world/#590d3498155f.

[35] Jeremy B. Zucker, Darshak S. Dholakia & Hrishikesh N. Hari, *Anti-bribery Compliance in India: Both Sword and Shield 3* (Dechert LLP Nov. 2016), https://www.dechert.com/files/Uploads/Documents/Lit%20-%20General/White%20Paper%20-%20Anti-Bribery%20Compliance%20in%20India%20FINAL%20-%2011-16.pdf.

89.    In particular, FCPA lawyers have stated that some of the "key high risk areas" for conducting business in India include "[o]btaining licenses and permits"; "[l]and acquisition"; "[s]etting up plants and operations"; and "[c]ustoms and taxes" – precisely the subject areas at issue here.[36]

90.    Given these facts, throughout the Relevant Period, Cognizant repeatedly acknowledged that noncompliance with anticorruption laws, and failure to implement adequate control systems to monitor and enforce compliance, could have serious negative consequences for the Company. In reports filed with the SEC during the Relevant Period Cognizant stated:

> Among other anti-corruption laws and regulations, we are subject to the United States Foreign Corrupt Practices Act, or FCPA, which prohibits improper payments or offers of improper payments to foreign officials to obtain business or any other benefit, and the U.K. Bribery Act. Violations of these laws or regulations could subject us to criminal or civil enforcement actions, including fines and suspension or disqualification from government contracting or contracting with private entities in certain highly regulated industries, any of which could have a material adverse effect on our business, results of operations and financial condition.[37]

91.    Accordingly, Cognizant assured investors that it did not make improper payments to foreign officials, and that it implemented a rigorous control system in order to ensure compliance with anticorruption laws, including the

---

[36] Anthony Campanelli, *Managing Corruption Risks in India* 4 (Deloitte LLP 2014).

[37] *See, e.g.,* 2014 Form 10-K, at 28.

FCPA. Cognizant published, and disseminated to investors on its website, its Code of Conduct. In it, Cognizant again acknowledged the importance of compliance with anticorruption laws and the maintenance of adequate controls to monitor that compliance, stating that "anti-corruption law violations come with severe legal penalties to the company, its executives and the individuals involved in such actions."[38] Thus, in a section entitled, "Preventing Corrupt Activities," Cognizant stated that the Company did not make improper payments to government officials to obtain any business or other advantage: "We do not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company."[39]

92.    Cognizant's Code of Conduct also represented that the Company would take several specific actions to vet payments to foreign officials and ensure their legitimacy, stating that any such payments would receive "pre-approval from our Legal Department," and that all such payments would be appropriately "reported and documented as part of the FCPA's and other laws' books and records requirements."[40]

---

[38] 2015 Code of Conduct, at 10.

[39] *Id.* at 9.

[40] *Id.* at 10.

93.    In addition, the Code of Conduct directed investors to the Anticorruption Policy, which Cognizant published and disseminated to investors through its website. The Anticorruption Policy set out certain proscriptions on conduct to which the Company purported to adhere, and set forth affirmative preventative actions that the Company purported to take. Pursuant to the Anticorruption Policy, Cognizant assured investors that the Company would:

- "never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual in order to obtain business for the Company or to secure an improper advantage for the Company";

- "conduct risk assessments, in consultation with our Legal Department, for certain activities involving officials in high-risk countries for corrupt practices";

- "ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed when making payments from the Company"; and

- "comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests . . . consistent with our Core Values and Standards of Business Conduct on transparency."[41]

94.    Cognizant also publicly assured investors that it was taking a number of additional concrete steps to ensure Company compliance with anticorruption laws. In the Anticorruption Policy, Cognizant told investors, among other things, that its Legal Department would review "red flag" transactions, including those transaction involving a government-related counterparty, and that "[p]eriodic

---

[41] Cognizant, *Cognizant Technology Solutions FCPA, UK Bribery Act and Anticorruption Policy* 2 (2011).

audits of compliance shall be performed by each business unit in coordination with our Legal Department" in order to "[m]onitor [a]nd [a]udit [c]ompliance [w]ith [the] Anticorruption Policy."[42]

95.    Cognizant touted both its Anticorruption Policy and its Code of Conduct in SEC filings throughout the Relevant Period. For example, Cognizant's 2014 Form 10-K stated, "we make available our code of business conduct and ethics entitled 'Cognizant's Core Values and Standards of Business Conduct' free of charge through our website. We intend to disclose any amendments to, or waivers from, our code of business conduct and ethics that are required to be publicly disclosed pursuant to rules of the SEC and the NASDAQ Global Select Market by posting it on our website."

96.    In SEC filings throughout the Relevant Period, Cognizant also assured investors that it maintained an adequate system of internal accounting controls, as mandated by the FCPA and the Sarbanes-Oxley Act ("SOX"). The FCPA imposes accounting requirements that operate as a complement to, and a means of enforcing, its anti-bribery provisions. Specifically, the FCPA requires issuers to keep books and records that accurately and fairly describe their transactions, and to develop and maintain an adequate system of internal accounting controls, in order to track payments and prevent bribery. SOX mandates, in part, that internal

---

[42] *Id.* at 3, 5, 7.

controls must be designed so as to "ensure that material information relating to the company . . . is made known to" officers responsible for certifying the accuracy of the company's public reports.

97.    A critical element of the internal accounting controls prescribed by the FCPA is called "tone at the top." "Tone at the top" refers to senior management's commitment to legal and ethical compliance and accurate reporting, expressed as a function of management initiatives, policies, and, most importantly, management's conduct. SOX also recognizes the primacy of "tone at the top" as a control mechanism in, among other things, its rules making a company's senior management ultimately responsible for the quality of an issuer's disclosure controls and financial reporting. Regulators and auditors likewise recognize "tone at the top" as a key internal control mechanism. For example, the *Resource Guide to the U.S. Foreign Corrupt Practices Act*, jointly issued by the DOJ and the SEC, emphasizes that an issuer's implementation of "an appropriate tone at the top" is a key factor in assessing the seriousness of an FCPA violation.[43]

98.    Similarly, then-SEC Commissioner Cynthia Glassman stated in an April 2003 speech on the SEC's implementation of SOX:

---

[43] Criminal Div., U.S. DOJ & Enf't Div., U.S. SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* 55 (Nov. 14, 2012), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf [hereinafter "*Resource Guide*"].

> [T]he ultimate effectiveness of the new corporate governance rules will be determined by the "tone at the top." Adopting a code of ethics means little if the company's chief executive officer or its directors make clear, by conduct or otherwise, that the code's provisions do not apply to them. . . . Corporate officers and directors hold the ultimate power and responsibility for restoring public trust by conducting themselves in a manner that is worthy of the trust that is placed in them.[44]

99.    Accordingly, Cognizant's maintenance of adequate internal control systems, including its "tone at the top," was critically important to investors because it ensured that the Company adhered to the Code of Conduct and Anticorruption Policy it purported to practice, and that the Company's public disclosures were accurate.

100.   In connection with Cognizant's SEC filings throughout the Relevant Period, and pursuant to SOX, D'Souza and McLoughlin signed certifications representing to investors that Cognizant's internal reporting controls were "effective" and were designed to "provide reasonable assurance regarding the reliability" of Cognizant's financial reports; that Cognizant's SEC filings were free from material misstatements and omissions, and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company"; and that there were no "significant deficiencies and material weaknesses in the design or operation" of Cognizant's internal controls that had not been disclosed.

---

[44] Cynthia A. Glassman, Commissioner, SEC, SEC Implementation of Sarbanes-Oxley: The New Corporate Governance (Apr. 7, 2003), https://www.sec.gov/news/speech/spch040703cag.htm.

101.   On Cognizant's website, the Company also touted the rigorousness of its internal controls, stating "Cognizant employs rigorous internal controls to ensure our commitment to ethical behavior, proper risk management and exemplary corporate conduct. Our internal controls are maintained by an effective and far-reaching corporate governance system implemented by our senior leadership team and overseen by an independent Board of Directors." Based on these statements, the Company assured investors that they could take comfort in the conduct of its management and the accuracy and completeness of its public disclosures.

102.   The cumulative effect of the statements summarized above was to drive Cognizant's stock price significantly higher throughout the Relevant Period. Specifically, Defendants' statements caused Cognizant's stock price to rise from $46.50 per share at the start of the Relevant Period to a Relevant Period high of more than $68 per share – an increase of more than 46%.

103.   Unfortunately for investors, as detailed below, Defendants' statements to investors concealed a bribery scheme that went to the core of Cognizant's SEZ operations and involved the highest levels of Cognizant management. This undisclosed bribery scheme rendered a host of Defendants' statements to investors materially false and misleading, including their statements: touting the significant benefits Cognizant received from its SEZ operations; representing that the

Company did not bribe foreign officials and took concrete steps to ensure FCPA compliance; assuring investors that the Company maintained reliable internal controls; and attributing the Company's performance to additional legitimate factors.

**D.    In Truth, Cognizant Bribed Indian Government Officials to Procure Valuable SEZ Licensing**

104.    Unbeknownst to investors, to secure the valuable SEZ licenses Cognizant repeatedly touted, the Company engaged in a long-standing bribery scheme through which it made several million dollars worth of improper payments to Indian government officials. As discussed below, Cognizant has admitted that, between 2010 and 2015, it made at least $6 million (over 400 million Indian rupees) in payments "relating to Company-owned facilities in India" that "may" have been "improper[] and in possible violation of the [FCPA]."

105.    Cognizant further admitted that, in its publicly reported financial statements, it improperly booked these payments as capital expenditures rather than operating expenses, which are deducted dollar-for-dollar against the Company's bottom line as they are spent. This had the effect of disguising the illicit payments as legitimate capital investments and inflating the Company's reported investments in its SEZ facilities, as well as its net income.

106.    Notably, Cognizant also has admitted that the bribery scheme was carried out by "senior management," and that its officers actually ***overrode*** the

Company's internal controls to facilitate the bribery scheme. Specifically, the Company ultimately admitted in its November 7, 2016 third quarter Form 10-Q that "certain members of *senior management* may have participated in or failed to take action to prevent the making of potentially improper payments by either *overriding or failing to enforce* the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India." As detailed below, chief among the senior management who carried out the scheme is Defendant Coburn.

107.   As revealed in the Securities Class Action, former Cognizant employees have corroborated the Company's admissions. Former Employee 1 served as a Cognizant Manager, Internal Audit & SOX Compliance from November 2014 through December 2015. Former Employee 1 was tasked with overseeing an FCPA compliance audit of Cognizant's Indian operations, which began in September 2014 and was completed in May 2015. Notably, notwithstanding the Company's representations that it conducted "periodic audits of [FCPA] compliance," Former Employee 1 reported that it was apparent based on the absence of prior-period audit documentation that an FCPA compliance audit had not been performed in at least two years prior to 2015. Former Employee 2, Cognizant's Assistant Vice President, Internal Audit from 2007 through 2012 and

the Company's Chief Audit Executive, stated that no FCPA-specific audits were performed during his/her tenure at Cognizant.

108.   Former Employee 1 further reported that the 2015 audit found evidence that payments related to procuring SEZ licensing were being made to Indian government personnel and that these payments were being improperly classified in Cognizant's internal systems. Specifically, Former Employee 1 explained that Cognizant coordinated its land and facility procurement through a contractor. Former Employee 1 reported that the 2015 audit turned up several invoices from this contractor that explicitly sought reimbursement for payments for licenses to operate in SEZs in Bangalore and elsewhere. While the local government had the power to grant SEZ licenses in the area, the payments were made to what appeared to be a private, nongovernmental entity. Upon investigating, Former Employee 1 discovered that key positions in the ostensibly private entity were held by government-affiliated individuals.

109.   While, as set forth above, the invoices made the purpose of the payments explicit (i.e., for SEZ licenses), Former Employee 1 stated that Cognizant internally recorded the payments as "lease payments." When Former Employee 1 interviewed Cognizant personnel, including a Director of Procurement and Director of Accounts Payable (individuals who were senior managers) about these transactions, he/she was unable to get a "straight cooperative answer," and,

instead, was met with "inconsistent responses and no backup to support what they were saying." According to Former Employee 1, the personnel interviewed were all saying something different, particularly about the purpose of the payments, and the inconsistency "raised a big red flag." Former Employee 1 stated that the team would "speak to three people" about the purpose of the payments and "get three different answers." Although Former Employee 1 could not recall the amount of the payments in question, he/she stated that the payments would have had to have been significant enough to be selected for auditing. Notably, Former Employee 1 reported that the audit team discovered these payments "fairly easily," by running a few searches through the Company's electronic database.

110. Former Employee 1 also reported that the 2015 audit turned up several "high risk" problems in Cognizant's internal controls. *First*, as described above, the audit revealed that numerous payments to Indian government-affiliated personnel had been improperly classified as lease payments or otherwise characterized in a way that was inconsistent with the nature of the actual transaction. *Second*, as stated in the Company's published Anticorruption Policy, all transactions involving government personnel were to be authorized by Cognizant's legal department. Former Employee 1, however, discovered that proper authorization was not being obtained for payments to government officials. *Third*, and relatedly, Former Employee 1 discovered that there were deficiencies in

the Company's disclosure controls, as payments to government officials were not being properly flagged as such for further vetting, as per the Company's anticorruption and internal control policies.

111. *Fourth*, contrary to Defendants' statements in the Anticorruption Policy, Former Employee 1 stated that Cognizant employees did not receive adequate FCPA compliance training. Specifically, Former Employee 1 noted that training materials were in English, rather than the language native to the employees being trained. Moreover, the training materials were generic, and were not specific to either the country in which employees operated or the specific positions they held. Unsurprisingly in light of these deficiencies, Former Employee 1 noted that the completion rate for compliance training was low. Corroborating Former Employee 1's reports, Former Employee 2, a highly placed audit executive, stated that his/her staff had no FCPA-specific training and that no FCPA training manuals even existed.

112. Former Employee 1 reported the findings of the 2015 audit described above to Cognizant's Associate Vice President of Audit, Abraham Verghese ("Verghese"), for inclusion in a formal final audit report. Former Employee 1 further reported that he/she was included on emails in which Verghese raised these findings with Cognizant's Assistant Vice President of Global Compliance & Ethics, Misty Pederson ("Pederson") – one of Cognizant's most senior compliance

executives.[45] Former Employee 1 stated that the final audit report would have been disseminated to senior Cognizant executives including Pederson, Bhavna Sharma (Senior Manager, Internal Audit), and Steve Casari (Vice President Enterprise Risk Management & Internal Audit). Former Employee 1 also stated that summary audit findings, at a minimum, would have been distributed to the Audit Committee of Cognizant's Board, which had approved the plan to conduct the FCPA audit, as well as D'Souza and McLoughlin.

113.  As discussed above, Cognizant has admitted that its "senior management" "participated" in the Company's bribery scheme by, among other things, overriding internal controls related to real estate permitting or refusing to enforce these controls. There is ample evidence that Coburn, the Company's President and former CFO, "participated" in Cognizant's scheme. Former Employee 3, Cognizant's Infrastructure Team Lead from July 2015 through January 2016, stated that Coburn was the "responsible authority" for overseeing Cognizant's leases in India. Former Employee 4, Cognizant's Associate Director - Strategic Sourcing from September 2011 through March 2015, stated that Coburn was "involved directly" in real estate transactions; "[h]e used to take a special interest." Moreover, Coburn, who had served as a senior Cognizant executive for

---

[45] Pederson's biography on the business networking website LinkedIn stated that she is "[r]esponsible for developing, sustaining, measuring, and communicating programs that ensure Cognizant associates are committed to compliance with all local laws and [the Company's] Code of Conduct."

seventeen years, suddenly resigned when the Board's corruption investigation was announced.

### E. The Facts in the Indictment, SEC Action, and SEC Order Further Establish Cognizant's Bribery Scheme and False Statements to Investors

114. As discussed above, the Indictment, SEC Action, and SEC Order are the result of a two-year investigation by the DOJ and SEC, and are based on Cognizant's own internal documents and the accounts of multiple current and former employees. Indeed, in a February 13, 2019 letter to Cognizant, the DOJ noted that Cognizant provided it with "all known relevant facts about the misconduct"—facts which Cognizant obtained through its own multi-year investigation conducted by its own counsel, at a cost of tens of millions of dollars. While the DOJ's investigation is still ongoing, the Indictment, the SEC Action, and the SEC Order strongly corroborate that Cognizant engaged in an illicit bribery scheme to secure lucrative SEZ permitting; that the scheme was conceived and orchestrated by some of the Company's most senior management, including Defendants Coburn and Schwartz; and that Cognizant, Coburn and Schwartz made and caused to be made numerous false statements to investors concealing the scheme. As explained below, the Indictment, SEC Action, and SEC Order set forth detailed facts demonstrating how, between 2014 and 2016, Cognizant—through Coburn, Schwartz and other senior executives—authorized the payment of at least

$3.6 million in bribes to Indian government officials to obtain permits required to build and operate lucrative SEZ facilities across India, including in Pune, Siruseri, and Chennai.

> **1.    Defendants Coburn and Schwartz Arranged $2.5 Million in Illicit Payments to Obtain Permitting Necessary to Create and Operate Cognizant's Largest SEZ Facility**

115.   Between in or about January 2014 and in or about January 2016, Coburn and Schwartz, as well as other senior Cognizant executives, engaged in a scheme to bribe one or more government officials in India to secure and obtain a planning permit (the "KITS Permit") necessary to construct and operate Cognizant's largest SEZ, the KITS Campus in Chennai. The Indictment makes clear that Cognizant could not have built and operated this crucial SEZ facility, nor enjoyed the lucrative SEZ benefits attendant to it, without the KITS Permit. Specifically, the Indictment explains that the KITS Permit was "a statutory approval that *was required prior to the commencement of the KITS Campus*," and states that the Permit was "discretionary and nonroutine."

116.   As discussed above, the KITS Campus was critical to Defendants' SEZ strategy. Located at 1 SEZ Avenue in Chennai, the capital of the state of Tamil Nadu, the KITS Campus would become the Company's largest facility in India, encompassing 2.7 million square feet and supporting between 17,000 and 20,000 Cognizant employees. The KITS Campus' SEZ status would provide

Cognizant with a significant business advantage by, among other things, allowing the Company to massively reduced taxes and operating costs associated with the work done by ***thousands*** of employees, as discussed above.

117.   Cognizant retained a construction firm (which, on information and belief, as set forth above, is believed to be L&T) in or about November 2011 to develop the KITS Campus. As noted in the Securities Class Action, CC#1, Cognizant's Vice President of Administration who resided in India, was Cognizant's primary liaison with L&T and directly oversaw development of the KITS Campus.

118.   Given its importance, Coburn was personally involved in the KITS Campus project from its inception, and received regular updates from CC#1. Indeed, Cognizant's February 7, 2011 press release that announced the construction project quoted Coburn touting the project as "part of our ongoing strategy of investing in our people, processes, systems, and infrastructure to support our long-term growth."[46]

119.   Coburn was responsible for personally approving any payments in excess of $500,000 that L&T requested from Cognizant for reimbursement of unanticipated costs associated with the agreed-upon scope of work (known as "variation claims" or "change order requests").

---

[46] Press Release, *Cognizant to Invest Over $500 Million in India Infrastructure Expansion* (Feb. 7, 2011).

120.   Cognizant's contract with L&T provided that L&T would obtain all statutory approvals and permits. Though, as noted above, the KITS Permit was statutorily required prior to the commencement of construction, L&T did not submit an application and fee for the Permit until on or about February 7, 2013, approximately fourteen months *after* beginning work on the KITS Campus. By that time, Cognizant had already invested significant resources in building the KITS Campus, which would be jeopardized without the required Permit.

121.   The Indian government had still not issued the KITS Permit by April 2014—more than a year since L&T had first submitted the KITS Permit application and fee, and over two years since L&T had begun work on the KITS Campus (without having obtained the required permitting). On April 21 and 22, 2014, with the timely completion of the KITS Campus in jeopardy, Defendants Coburn and Schwartz participated in video conference calls with CC#1 and Thiruvengadam to discuss paying a $2 million bribe (more than 120 million INR) to an official with the Chennai Metro Development Authority in order to secure the KITS Permit and complete this critical SEZ facility. On the calls, CC#1 told Coburn and Schwartz that the government official had demanded the bribe in exchange for approving the Permit and asked for their guidance. As set forth in the Indictment, during the calls, Coburn and Schwartz agreed with CC#1 and Thiruvengadam that L&T would pay the bribe, and that Cognizant would

reimburse L&T for the bribe payment through a change order request at the end of the project.

122.   Specifically, to disguise Cognizant's repayment of the illegal bribe to L&T, Schwartz and Coburn agreed that L&T would submit a number of fraudulent change order requests at the end of the project totaling $2 million. The fact that Coburn had sole authority to approve large change orders was key to the execution of Defendants' scheme. Coburn was to use that authority to approve payment of the phony change order requests to effectuate disbursement of the bribe monies, thus causing the repayment to be falsely recorded in Cognizant's books and records as *bona fide* construction costs. To ensure that their fraudulent scheme went undetected, Schwartz emphasized during the April 22, 2014 video conference that the reimbursement payment should not stand out in the change order request.

123.   In order to secure L&T's cooperation in their scheme, Coburn directed CC#1 to tell L&T that Cognizant would withhold future payments related to the KITS Campus construction until it delivered the bribe to the Indian government official, and to notify L&T that its future business with Cognizant was in jeopardy unless it complied. CC#1 did as directed. Several weeks later, L&T advised CC#1 that it would take necessary steps to secure and obtain the KITS Permit and that it had hired a special third-party consultant to make the bribe payment.

124.   To further entice L&T to participate in the illegal bribery scheme, Coburn authorized an additional $500,000 payment to L&T. As with the $2 million bribe, Coburn orchestrated the submission of fake change order requests to Cognizant, used his authority to approve those requests to disburse the illicit payment to L&T, and, thus, caused the additional payment to be falsely recorded in Cognizant's books and records as *bona fide* construction costs.

125.   As noted above, following the April 22, 2014 calls, L&T advised CC#1 that it had hired a special third-party consultant to make the bribe payment. On or about May 17, 2014, CC#3 emailed CC#1, writing: "As committed, we are going ahead with approval part (not to inform your site team & others, except your top management if required so)." CC#3 also noted that Cognizant had approximately $17 million in outstanding bills owed to L&T and asked for CC#1's assistance in getting Cognizant to pay those bills.

126.   CC#1 forwarded the above email to, among others, Coburn and Thiruvengadam, in which CC#1 stated that Cognizant had "some positive traction" on the KITS Campus "approval process" and that L&T was "moving full swing on the process." CC#1 also wrote that L&T had "appointed a new liaison consultant to process the approval" and that L&T "was confident [Cognizant] will receive approval by this month end/early June." Discussing L&T's request regarding its outstanding bills, CC#1 stated that the total "on hold" payments were

approximately $17 million, "the freeze on payment is hurting them very badly," and CC#1 believed that it was a "good idea to release payment."

127.   Nonetheless, still lacking the critical KITS Permit, Coburn agreed to release only partial payment of money owed to L&T for legitimate construction work. On May 20, 2014, Coburn wrote in an email to CC#1 and others, "Suggest you pay 7mm and hold the balance 10m until they deliver?"

128.   Coburn thereafter directed the co-conspirators not to discuss the bribery scheme over email. On or about June 16, 2014, Thiruvengadam sent CC#1 an email that read, "[Coburn] wanted an update on the [KITS Campus] approval (no [e]mails he said)."

129.   On or about June 30, 2014, L&T received a government order needed to obtain the KITS Permit, which the bribe recipient had promised to secure. That day, CC#3 emailed a scanned copy of the order to CC#1 and others, writing: "As discussed, nobody should know that [L&T] has got this [order.] Request to maintain this confidentiality." Later that day, CC#1 sent the scanned government order, without CC#3's note, to several Cognizant executives, including Thiruvengadam and Defendants Coburn and Schwartz, writing "We will now start firm planning for occupation. Thanks to [L&T] for support."

130.   In order to sustain the pressure on L&T to secure the completed KITS Permit, Coburn continued to withhold payment owed to L&T for legitimate

construction work. Coburn responded to a June 30, 2014 email from CC#1 asking for permission to unfreeze the remaining $10 million owed to L&T by instructing CC#1 to "pay $5mm of the $10mm" and to "hold the other $5mm until all approvals are finalized and received."

131.   A little more than four months later, on or about November 5, 2014, the KITS Permit was issued to Cognizant. On or about November 10, 2014, CC#1 emailed Defendant Coburn, copying Thiruvengadam and others, to announce that the KITS Permit had been issued and recommending that Cognizant release L&T's remaining funds that Cognizant had frozen. Two days later, Coburn responded via email, "OK."

132.   Around this time, as the KITS Campus project neared completion, L&T began submitting change order requests to Cognizant for reimbursement of unanticipated construction costs, in accordance with the plan devised by Coburn and Schwartz. Specifically, L&T submitted approximately forty-five claims totaling approximately $25 million. These claims included an approximately $2.5 million request for "statutory approvals - planning permit" listed as part of a larger $3.7 million claim for "approvals/campus regularization." This $2.5 million request corresponded to the approximately $2 million bribe payment and the $500,000 additional payment to L&T for delivering the bribe.

133.   Circulated within Cognizant as an attachment to an email on or about October 29, 2014 was a document entitled "Variations List Discussion Document," which included the $3.7 million claim along with the description "Approvals/Campus Regularisation." A subsequent of the document, circulated as an attachment to an email on or about November 12, 2014, contained an item in the same amount, but with the description shortened to just "Statutory Approvals." On or about January 13, 2015, CC#1 sent an email to Coburn and others that included a chart summarizing L&T's pending change order requests, and which contained this item for "Statutory Approvals."

134.   Knowing that a multi-million dollar line item for "statutory approvals" would likely raise a red flag and invite further inquiry from Cognizant's auditors, and in keeping with Schwartz's April 2014 warning that the reimbursement payment should not stand out in the change order request, CC#1 instructed a co-conspirator who was a member of Cognizant's real estate group to create a fake version of the "Variations List Discussion Document" that replaced the entire $3.7 million claim for "approvals/campus regularization" (which included the $2.5 million "statutory approvals" request) with eleven previously-rejected claims worth roughly the same amount. CC#1 then retroactively "accepted" the previously-rejected claims. This substitution would ensure that

L&T was reimbursed for the bribe payment and the additional $500,000, while disguising the true purpose of the payment.

135.   In or about January 2015, CC#1 told Coburn that certain line items in the fake Variations List Discussion Document had been used to conceal Cognizant's bribe payments, including the additional payment to L&T. By email on or about January 15, 2015, the fraudulent change orders and supporting Excel spreadsheets were forwarded to Coburn for approval. Coburn preliminarily approved these payments in a February 3, 2015 email to CC#1, in which he stated, "Approved."

136.   To facilitate the formal approval of the bribe payments by Cognizant's finance unit, on or about March 11, 2015, Defendant Coburn falsified a spreadsheet and related approvals containing and incorporating the false change order requests in connection with the KITS Campus.

137.   On or about March 13, 2015, Defendant Coburn formally approved the illicit payments, sending an email to a member of Cognizant's finance unit authorizing a payment to L&T that included reimbursement for the $2 million bribe and the $500,000 additional payment for making the bribe. Based on their communications with CC#1 and Thiruvengadam as set forth above, Coburn and Schwartz knew that the reimbursement for the bribe would be and was included in

the amount Cognizant agreed to pay L&T, and that the change order documents would be and were falsified to conceal the true nature of those payments.

138.   Based on Coburn's approvals, Cognizant issued several separate payments to L&T to cover the cost of L&T's change order requests between March 2015 and January 2016 that included approximately $2 million for the bribe and $500,000 for the additional payment for paying the bribe.

**2.   To Conceal the Illicit Bribery Scheme, Defendants Coburn and Schwartz Made and Caused to Be Made False and Misleading Statements and Omissions in Cognizant's SEC Filings and Sustainability Reports**

139.   As described further below, Defendants Coburn and Schwartz took numerous steps to conceal the bribery scheme from the investing public, including: a) falsifying Cognizant's books, records, and accounts, thus falsifying Cognizant's publicly-filed earnings releases and financial statements; b) preventing discovery of the scheme by Cognizant's auditors, which ensured that Cognizant would publicly issue the financial statements and earnings releases containing the false information that Coburn and Schwartz created; and c) making and causing to be made false and misleading statements in Cognizant's public Sustainability Reports, including by falsely certifying their compliance with Cognizant's Code of Conduct.

140.   As discussed above, upon learning of the $2 million bribe demand during the April 2014 video teleconferences and approving it, Defendant Coburn,

with Schwartz's approval, authorized the use of fraudulent change orders to disguise Cognizant's reimbursement of $2 million to L&T for the bribe payment. In addition, Coburn later authorized an additional $500,000 payment to L&T for delivering the bribe, also to be paid through fraudulent change orders.

141.   Coburn—having served as Cognizant's CFO and President—and Schwartz—having served as the Company's General Counsel—knew that these actions would cause Cognizant to improperly record the illicit payments in Cognizant's books and records as *bona fide* construction expenses. Coburn further knew that the bribery scheme would cause Cognizant to falsely and improperly record the payments in Cognizant's books and records as *bona fide* expenses related to construction of the KITS Campus because Coburn personally approved the fraudulent change orders.

142.   Coburn and Schwartz approved and executed a plan to conceal the bribery scheme that necessarily entailed deliberately falsifying Cognizant's books, records, and accounts, which were used to generate Cognizant's Relevant Period financial statements and earnings releases. Thus, as these Defendants knew, the bribery scheme would also cause Cognizant's publicly reported financial statements to be falsified. By disguising the bribes as *bona fide* construction costs, these Defendants understood that these expenditures would be capitalized, rather than expensed, thus overstating capital expenditures, understating operating

expenses, and overstating earnings in Cognizant's publicly-reported financial statements.

143.   In addition, Defendant Schwartz, as Cognizant's Chief Legal Officer, personally signed and authorized the filing of each of Cognizant's Forms 8-K that publicly disseminated Cognizant's false earnings releases for each reporting period during the Relevant Period. Specifically, as discussed further below, Schwartz signed Forms 8-K filed with the SEC on May 4, 2015, August 5, 2015, November 4, 2015, February 1, 2016, May 6, 2016 and August 5, 2016, attaching earnings releases that, as Schwartz knew, misstated Cognizant's capital expenditures, operating expenses, and net income.

144.   Coburn and Schwartz also took a number of steps to ensure that the truth about Cognizant's reported financial information would not be uncovered, and that the false financial information would be reported to investors. As described further below, Defendants Coburn and Schwartz concealed the bribery scheme from Cognizant's auditor in connection with its audits of the Company's financial statements from 2014 through 2016. Had Cognizant's auditor learned about the bribery scheme, the auditor would not have provided unqualified audit opinions to accompany Cognizant's annual reports during that time, thereby precluding the false information from being publicly reported (as SEC regulations require that annual reports be audited). Thus, this deception by Coburn and

Schwartz enabled Cognizant to publicly release the false and misleading financial information that Coburn and Schwartz created and authorized, as described above.

145.  *First*, in order to conceal the improper payments to L&T, Defendants Coburn and Schwartz made false and misleading statements and omissions to Cognizant's auditor concealing the bribery scheme, the disguised payments to L&T, the resulting false books and records of Cognizant, and their intentional circumvention of Cognizant's Code of Ethics and internal accounting controls. Indeed, the SEC Action states that "Coburn and Schwartz lied to Cognizant's auditor" by making "false and misleading statements or omissions to Cognizant's auditor in connection with its audits of the company's financial statements from 2014 through 2016." These lies by Coburn and Schwartz concealed the bribery scheme, "the resulting false books and records of Cognizant, and their intentional circumvention of Cognizant's Code of Ethics and internal accounting controls."

146.  *Second*, between August 2014 and June 2016, Defendant Coburn signed false management representation letters that were provided to Cognizant's auditor during its audit, review, and examination of Cognizant's financial information, including Cognizant's financial statements. As stated in the SEC Action, this false financial information "was incorporated by reference or attached to periodic and annual reports filed with the [SEC]"—in other words, it was contained in the false SEC filings at issue in this case. These false management

representation letters were essential to causing Cognizant to report false financial information to investors. As discussed above, any refusal by Coburn to affirm that he was unaware of any fraud inside the Company, would have surely raised red flags with Cognizant's auditors. GAAS AU 333 and 722.24 specifically require that members of management provide such representation letters for both annual and quarterly reports. Each of Coburn's management representation letters falsely stated that:

> We acknowledge our responsibility for the design and implementation of programs and controls to provide reasonable assurance that fraud is prevented and detected.

> We have no knowledge of any fraud or suspected fraud affecting the Company involving: a) Senior management; b) Management or other employees who have significant roles in internal control over financial reporting; or c) Others where the fraud could have a material effect on the condensed consolidated interim financial statements.

> There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency.

147.   In fact, as described above, Defendant Coburn knew at the times that he signed these false management representation letters that he, with Defendant Schwartz's approval, had authorized Cognizant to execute a scheme to bribe an Indian government official so as to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus. Coburn also knew when he signed the false management representation letters that, at his

direction, Cognizant had concealed these illicit payments through fraudulent change orders and circumvented the Company's internal controls, which resulted in a series of improper payments to L&T between 2015 and 2016, and that the books, records and accounts of Cognizant – and its public financial statements – were thereby falsified.

148.   *Third*, as set forth in the SEC Action, Coburn and Schwartz signed numerous false SOX "sub-certifications" in connection with the Company's financial reports filed with the SEC between July 2014 and January 2016. As discussed below, SOX requires that an issuer's CEO and CFO certify the completeness and accuracy of financial reports filed with the SEC, the effectiveness of the issuer's internal controls, and the absence of disclosure deficiencies. In order to verify the accuracy of these attestations, Cognizant's CEO and CFO relied on sub-certifications from other members of senior management, including Coburn and Schwartz, attesting to the accuracy of the Company's financial reports and integrity of its controls. Without these sub-certifications, D'Souza and McLoughlin would have been unable to sign their own certifications required by SOX, and the Company would have been unable to file the financial reports with the SEC. Moreover, any refusal by a member of senior management to sign a sub-certification would surely have raised red flags to the auditor about the accuracy of the Company's SEC filings and would have also precluded filing the

financial reports. Accordingly, Coburn and Schwartz's false sub-certifications were a crucial step in the dissemination to investors of Cognizant's false financial reports.

149.   In their sub-certifications, Coburn and Schwartz falsely stated, among other things, that: (1) Cognizant's internal controls had been in force and effective; (2) they had disclosed to Cognizant's CEO and CFO all known deficiencies in the operation of the internal controls; (3) they had disclosed to Cognizant's CEO and CFO "any known fraud, whether or not material, that involves management or other employees, within my area of responsibility, who have a significant role in the Company's internal controls"; and (4) that the financial information for each relevant period "does not contain any untrue statement of fact or omit to include a material statement of fact necessary to make such financial information, in light of the circumstances under which such financial information was compiled, not misleading."

150.   In fact, at the time that Defendants Coburn and Schwartz executed each of these certifications, Coburn and Schwartz knew that they had authorized Cognizant to execute a scheme to bribe an Indian government official so as to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus. Coburn and Schwartz further knew that they had approved a plan to conceal the bribery scheme and circumvented the Company's

internal controls, which necessarily entailed deliberately falsifying Cognizant's books, records, and accounts – and, in turn, its public financial statements.

151.   In addition to the facts set forth in the SEC Action, the Indictment also provides further specific examples of false statements that Coburn and Schwartz made in connection with Cognizant's SEC filings at issue in this action, which enabled them to be published to investors. Specifically, the Indictment states that "Coburn, Schwartz and others, in connection with the preparation of Cognizant's filing of its annual report with the SEC, made and caused to be made false, fraudulent, and misleading representations and omissions in [Cognizant's] Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaires for the year ended December 31, 2014 and the year ended December 31, 2015"—the two Forms 10-K at issue in this case—"including, but not limited to, providing false answers to questions relating to: bribes or kickbacks; disguised or intentionally mis-recorded entries in Cognizant's books and records; and transactions that may have violated Cognizant's Code of Conduct."

152.   Similarly, the Indictment states that "Coburn, Schwartz, and others, in connection with the preparation of Cognizant's SEC filings, made and caused to be made false, fraudulent, and misleading representations and omissions in Sarbanes-Oxley Quarterly Global 302 Certifications for the quarter ending June 30, 2014 and the quarter ending March 31, 2015, including, but not limited to, falsely certifying

that Cognizant's internal controls had been in force and effective, and that they had disclosed to Cognizant's Chief Executive Officer and Chief Financial Officer all known deficiencies in the operation of the internal controls and any known fraud involving management or other employees who had a significant role in Cognizant's internal controls."

153.  In 2014 and 2015, Cognizant published Sustainability Reports that, among other things, stated to investors that there were "no incidents" of corruption and (in the 2015 Sustainability Report) that "Cognizant treats reports of misconduct seriously." These statements were false and misleading: as discussed above, Cognizant—through its most senior management, including Defendants Coburn and Schwartz—was engaged in a bribery scheme.

154.  Defendants Coburn and Schwartz made and caused to be made these false and misleading statements in Cognizant's Sustainability Reports. Specifically, the Sustainability Reports incorporated information from certifications provided by Coburn and Schwartz throughout the Relevant Period. As set forth in the SEC Action, from 2014 through 2016, Coburn and Schwartz submitted false certifications stating that they adhered to Cognizant's "Core Values and Standards of Business Conduct"—which, as described above, required compliance with the Company's anti-corruption policy, the maintenance of accurate books and records, and compliance with all laws, rules and regulations

applicable to the Company in India and wherever Cognizant conducted business. Yet, at the time that Coburn and Schwartz executed these certifications, they knew that they had authorized Cognizant to execute a scheme to bribe an Indian government official to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus. They also knew that they had approved a plan to conceal the bribery scheme which necessarily entailed deliberately falsifying Cognizant's books, records, and accounts—and consequently, its public financial statements.

155. In addition, Cognizant's Sustainability Reports state that "Cognizant's President," *i.e.*, Coburn, was responsible for monitoring the Company's sustainability performance, including its compliance with anti-corruption laws, "and reporting the results of this review to our Board of Directors," including the CEO, who signed and approved the report. Coburn's responsibility for this function further demonstrates his authorization of, and control over, the false information in the Sustainability Reports.

156. Likewise, Schwartz furnished information for inclusion in, and participated in approving, Cognizant's Sustainability Reports. As Cognizant's Chief Legal Officer, Cognizant's compliance function reported to Schwartz. Schwartz was ultimately responsible for monitoring and ensuring Cognizant's compliance with anti-corruption laws. Thus, Schwartz was ultimately responsible

for monitoring and reporting the false compliance data included in the Sustainability Reports.

157.   As revealed in the SEC Order, around the same time Defendants Coburn and Schwartz authorized and concealed the bribery scheme described above, Cognizant—acting through its senior executives—engaged in very similar bribery schemes involving at least two other SEZ facilities.

158.   The bribery scheme in Pune also involved the construction of a commercial office facility with L&T as Cognizant's builder.

159.   The Pune facility was also part of Cognizant's SEZ strategy. Cognizant had announced the construction of the Pune facility in the same February 7, 2011 press release announcing construction of the KITS Campus, which also noted that the Pune facility was in a SEZ. As noted above, that press release also indicates Defendant Coburn's involvement, quoting him as describing the construction projects as "part of our ongoing strategy of investing in our people, processes, systems, and infrastructure to support our long-term growth."

160.   L&T began construction of the Pune facility in 2012. L&T began construction prior to the issuance of necessary permits, including specifically an environmental clearance. Thereafter, Cognizant—acting through its senior executives—authorized L&T to pay, on Cognizant's behalf, a $770,000 bribe to a

government official in exchange for issuing the permit necessary to construct and operate the SEZ facility.

161.   Just as with the scheme that Coburn and Schwartz implemented to obtain the KITS Permit, Cognizant reimbursed L&T for the bribe through false change order requests: in this instance, after the bribe had been paid in early 2013, L&T sought reimbursement through a change order request submitted in April 2013 containing a line item for "Liasoning [sic] and consultations charge towards Environmental clearance." Cognizant rejected the change order, but later approved the payment after L&T falsely changed the rationale to "Change in the make of Workstation from Featherlite to Art matrix." As noted above, with respect to the KITS Campus, Coburn's authorization was required for change order requests of $500,000 or more—a threshold that this change order easily exceeded.

162.   Cognizant ultimately reimbursed L&T for the bribe payment in January 2014 pursuant to the phony change order. As a result, Cognizant falsely reported this illegal bribe as *bona fide* capital expenses—and thereby overstated the Company's earnings—in Cognizant's Relevant Period financial statements and earnings releases.

163.   The bribe scheme in Siruseri again involved the construction of a commercial office facility with L&T as Cognizant's builder and again related to the Company's SEZ strategy: Cognizant's operations in Siruseri are in SIPCOT IT

Park, a designated SEZ. In its 2009-2010 Annual Report, L&T stated that the "SEZ at Siruseri for Cognizant" was a "major order[] bagged."

164. In Siruseri, Cognizant—acting through its senior executives—authorized L&T to pay $840,000 in bribes to government officials for the issuance of several permits required to construct and operate the SEZ facility, including a planning permit, a power permit from the local electricity board, and an environmental clearance. After L&T made the payments in or around 2012, and Cognizant thereafter received the permits, L&T submitted false change order requests for several inflated or unjustified work items. Again, after Cognizant rejected the initial requests, the sham descriptions were revised and Cognizant approved the false change orders. As with Pune, the size of the change order request significantly exceeded the $500,000 threshold needed for Defendant Coburn's approval.

165. Cognizant ultimately reimbursed L&T for the Siruseri bribe payments in installments between 2015 and 2016. Again, Cognizant falsely reported this illegal bribe as *bona fide* capital expenses—and thereby overstated the Company's earnings—in Cognizant's Relevant Period financial statements and earnings releases.

**F.     The Truth Is Finally Revealed**

166.   On September 30, 2016, Cognizant shocked investors by announcing, in a Form 8-K filed with the SEC, that its Board was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws."[47]

167.   In that same filing, Cognizant also announced that Coburn, whom analysts had described as "a leading face of CTSH to the investment community," a "key executive," and "a major contributor to the development of the company's strategy since its inception," had resigned amidst the Board's corruption investigation and was being replaced as President by then-CEO of IT Services Rajeev Mehta. Analysts noted the abruptness of Coburn's departure, pointing out that he had "been attending/participating at recent investor conferences."[48]

168.   Analysts and investors were shocked by Cognizant's September 30, 2016 disclosures. For example, in a September 30, 2016 report, Argus analysts downgraded Cognizant, characterizing the "announced resignation of the company's president amid a corruption investigation in India" as "***blockbuster***

---

[47] Cognizant Tech. Sols. Corp., Current Report (Form 8-K), at Item 8.01 (Sept. 30, 2016) [hereinafter 2016 Form 8-K].

[48] *Cognizant Gags Staff, Steps up Graft Probe*, Times of India (Oct. 3, 2016, 4:00 AM IST), http://timesofindia.indiatimes.com/business/india-business/Cognizant-gags-staff-steps-up-graftprobe/articleshow/54646587.cms.

*news*."[49] These analysts observed that "[g]iven that a top executive has resigned, . . . we see risks that the illegal practices could be extensive and long-lived. Additional agencies such as DoJ and SEC could conduct investigations of their own, and this matter could overhang the CTSH shares [for] a significant amount of time."[50] In a September 30, 2016 report, RW Baird analysts expressed deep concern that illegal payments made to procure SEZ permitting could have profoundly adverse consequences for Cognizant, noting that, "[w]hile we haven't seen this in the past, we consider possible outcomes to include reputational damage – could hurt revenue growth via client loss/limited client wins, fines and potential limits on operations in certain areas."[51]

169.  In a September 30, 2016 report, Jefferies analysts similarly expressed shock at the Company's "two surprising announcements" concerning the Board's investigation into FCPA violations and Coburn's resignation, specifically noting

---

[49] Jim Kelleher, CFA, *Change in Rating: Downgrading to HOLD on Corruption Probe* 1-2 (Argus Research Co. Sept. 30, 2016).

[50] *Id.* at 1.

[51] Jochelle Mendonca, *Cognizant Investigating Improper Payments Paid in India; Informs DOJ, SEC*, ETtech (Oct. 1, 2016, 09:51 IST), http://tech.economictimes.indiatimes.com/news/corporate/cognizant-investigating-improper-payments-paid-in-india-informs-doj-sec/54607942.

that Coburn's "**sudden departure was not anticipated in our opinion**."[52] The

report further noted that "we don't believe [Coburn] will receive any severance."[53]

170.    That same day, Evercore ISI published a report opining that

Defendant Coburn's resignation may have been "as a direct result of this

investigation":

> This morning Cognizant announced that Gordon Coburn, President, resigned and [has] been replaced with Rajeev Mehta, CEO of [Cognizant] IT Services. In conjunction, [Cognizant] is conducting an internal investigation into whether certain payments relating to licenses and permits on a small number of its 12 owned facilities in India were made improperly and in possible violation of the [FCPA] and other applicable laws. While not specified, **we believe Gordon Coburn may have resigned as a direct result of this investigation** and potentially other issues [Cognizant] may be facing given a weak discretionary spending environment in the Company's large Financial Services and Healthcare verticals.[54]

171.    Morgan Stanley analysts likewise stated in a September 30, 2016

report that "investors may assume a connection" between Coburn's resignation and

the announcement of the FCPA investigation, "given the timing" of the two

events.[55]

---

[52]  Jason Kupferberg, Equity Analyst, *Surprise Management Departure and Possible FCPA Violation* 1 (Jefferies Group LLC Sept. 30, 2016).

[53]  *Id.*

[54]  David Togut, CFA et al., *Nibble on Bad News* 1 (Evercore ISI Sept. 30, 2016).

[55]  Brian Essex, CFA et al., *CTSH Quick Comment* 2 (Morgan Stanley Sept. 30, 2016).

172.   Finally, Morningstar issued a September 30, 2016 report emphasizing that Cognizant's "unexpected" announcement had "surprised the market" and was "clearly a black eye for the company and could potentially provide dark clouds" over the "reputation of the firm's consulting franchise."[56] A few days later, on October 3, another Morningstar report noted: "Given that Coburn had been with the company for over 20 years and president since 2012, the quickhanded nature of his dismissal seems to indicate a link to the FCPA investigation."[57]

173.   On September 30, 2016, in response to the Company's disclosures, Cognizant's stock price swiftly declined. The Company's stock price fell more than 13%, or $7.29 per share, declining from $55.00 to $47.71 on the year's highest trading volume.

**G.   Cognizant Has Admitted that the Company's Relevant Period Representations Were False and that Senior Management Participated in Making Improper Payments to Indian Officials, and Coburn and Schwartz Have Been Indicted and Sued by the SEC for This Misconduct**

174.   Since the end of the Relevant Period, Cognizant has acknowledged that: (1) Cognizant's "senior management" "may have participated in" making $6

---

[56] Brian Colello, CPA, *Cognizant's Shares Remain Undervalued as the Firm Investigates Possible Corruption Violations* 1 (Morningstar Equity Research Sept. 30, 2016).

[57] Andrew Lange, Equity Analyst, *Cognizant in Possible Violation of Foreign Corrupt Practices; Scant Detail, Stock Still Undervalued* 1 (Morningstar Equity Research Oct. 3, 2016).

million dollars' worth of corrupt payments to Indian government officials to procure permits relating to the Company's Indian facilities including by, among other things, "overriding" the very internal controls designed to detect and prevent such misconduct; (2) the Company's prior reported financial results were misstated because millions of dollars in bribes were improperly reported as "capital expenditures" (i.e., legitimate expenditures to build or maintain physical facilities); (3) Defendants' representations about Cognizant's compliance with anticorruption laws and the adequacy of its internal controls were both false; and (4) senior management knew that the Company's internal controls were inadequate to detect and prevent the bribery scheme.

175. On November 7, 2016, Cognizant filed its third quarter results on Form 10-Q with the SEC. In that filing, the Company admitted that Cognizant's "senior management may have participated" in making – or had allowed to be made – corrupt payments to procure licenses for the Company's Indian facilities:

> During the closing process for the third quarter of 2016, based on the results of the internal investigation to date, we concluded that as of December 31, 2015 and in subsequent interim periods, *we did not maintain an effective control environment. Specifically, we did not maintain an effective tone at the top as certain members of senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India.*

\*     \*     \*

As a result of the foregoing, *we have determined that a material weakness existed as of December 31, 2015, and continues to exist in subsequent interim periods, in our internal control over financial reporting.*[58]

176.   Accordingly, Cognizant admitted in that Form 10-Q that its senior management was deeply involved in the bribery scheme and that its prior statements concerning the integrity of its internal controls were false. Cognizant was forced to correct the certifications in its 2015 Form 10-K and first and second quarter 2016 Forms 10-Q – that "our disclosure controls and procedures and internal controls over financial reporting were effective" – to state the opposite, instead – "that [those controls] as of December 31, 2015 were ineffective."[59]

177.   The Company further admitted that it had misstated its prior financial results to conceal Cognizant's bribery scheme. Specifically, to hide the purpose and nature of these payments, the Company had mis-booked many of the improper payments as capital expenditures – investments in physical assets that may be depreciated – rather than operating expenses, which are deducted dollar-for-dollar against the Company's bottom line as they are spent. The Company stated:

> To date, the investigation has identified a total of approximately $ 5.0 million in payments that may have been recorded improperly. During the three months ended September 30, 2016, we recorded an out-of-

---

[58] Cognizant Tech. Sols. Corp., Quarterly Report (Form 10-Q), at 7 (Nov. 7, 2016) [hereinafter Q3 2016 Form 10-Q].

[59] *Id.*

period correction related to $ 3.1 million of such payments that were previously capitalized that should have been expensed. The remaining $1.9 million of such payments remains under investigation. The recorded correction resulted in an increase of selling, general and administrative expenses of $ 3.1 million, a reduction in depreciation and amortization expense of $ 0.4 million, and a reduction in property and equipment, net of $ 2.7 million.[60]

178.   In its 2018 Form 10-K, the Company updated these findings, stating that it "recorded out-of-period corrections related to $4 million of such payments that had been previously capitalized that should have been expensed."[61]

179.   On November 7, 2016, Cognizant held its Q3 2016 earnings conference call with analysts and investors. During this call, D'Souza reiterated that the Company's senior management was involved in the scheme. He further stated that the members of senior management who participated in the scheme were no longer with the Company:

> [W]e discovered in the course of the investigation that certain members of senior management may have been aware of or participated in the matters under investigation. Any such conduct would be inconsistent with our core values. Based on the results of the investigation to-date, those who may have been involved are no longer with the company or in the senior management position.[62]

---

[60] *Id.* at 26-27.

[61] Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 21 (Feb. 29, 2019) [hereinafter 2018 Form 10-K].

[62] Tr. of Q3 2016 Earnings Call at 2 (Bloomberg Nov. 11, 2016).

180.   D'Souza's statement leaves little doubt that Coburn, the Company's former President, was personally involved in the bribery scheme. As noted above, at the time D'Souza made this statement, Coburn was "no longer with the Company" because he had suddenly and surprisingly "resigned" just three days before the Company disclosed the investigation into the improper payments.

181.   Cognizant also has acknowledged that its representations in its credit agreement with a commercial bank syndicate that the Company was compliant with anticorruption laws was "materially incorrect."[63] Specifically, in its 2014 credit agreement, which the Company publicly filed with the SEC on November 20, 2014, Cognizant represented that:

> [Cognizant], its Subsidiaries and their respective directors, officers and employees, and to the best knowledge of [Cognizant,] its affiliates and agents, have not engaged in any activity or conduct which would violate any applicable Anti-Corruption Laws, and are in compliance with Anti-Corruption Laws and applicable Sanctions and are not engaged in any activity that would reasonably be expected to result in [Cognizant] being designated as a Sanctioned Person.[64]

In its third quarter 2016 Form 10-Q, Cognizant acknowledged that the existence of the bribery scheme rendered this statement false and that the Company was therefore forced to secure a waiver of default from the syndicate and amend its

---

[63] Q3 2016 Form 10-Q, at 12, 42, 53.

[64] Cognizant Tech. Sols. Corp., Current Report (Form 8-K), Ex. 10.1 at 52-53 (Nov. 20, 2014).

credit agreement.[65] Specifically, this statement was amended to read, in pertinent part, "to the best knowledge of the Borrower, its affiliates and agents, . . . ***except for the Disclosed Matters***, [Cognizant has] not engaged in any activity or conduct that would violate any applicable Anti-Corruption Laws," with the Disclosed Matters defined as the Company's September 30, 2016 disclosure about the bribery scheme.[66]

182.   On February 8, 2017, in connection with its fourth quarter 2016 earnings call, Cognizant provided another update to its ongoing investigation of corrupt payments made to Indian officials. The Company disclosed that it had discovered another $1 million in improper payments, bringing the total amount of bribes paid to $6 million.[67]

183.   On March 1, 2017, Cognizant filed a Form 10-K with the SEC, which disclosed that the bribery scheme had been ongoing since at least 2010. Specifically, the 2016 Form 10-K stated: "To date, the investigation has identified

---

[65] *See* Q3 2016 Form 10-Q, at 12.

[66] *Id.* at Ex. 10.1.

[67] Tr. of Q4 2016 Earnings Call at 7-8 (Bloomberg Feb. 8, 2017).

a total of approximately $6 million in payments made between 2010 and 2015 that may have been recorded improperly."[68]

184.   The 2016 Form 10-K also demonstrated that the bribery scheme was widespread and involved multiple members of senior management and other Company employees. Under "Remediation Plans," the 2016 Form 10-K reiterated that multiple members of senior management were involved with the bribery scheme and acknowledged that additional Cognizant employees may be disciplined:

> [T]he members of senior management who may have participated in or been aware of the making of the identified potentially improper payments and failed to take action to prevent the making of the identified potentially improper payments were no longer with the Company or in a senior management position as of December 31, 2016. Additional personnel actions have been taken with respect to other employees and further actions may be required.[69]

185.   The Company further acknowledged that the cost of the scandal was ongoing and severe, stating: "In 2016, we incurred $27 million in costs related to the FCPA investigation and related lawsuits. We expect to continue to incur expenses related to these matters in 2017 and future periods."[70]

---

[68] Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 37 (Mar. 1, 2017) [hereinafter 2016 Form 10-K].

[69] *Id.* at 58.

[70] *Id.* at 37.

186.   During its October 30, 2018 earnings call, the Company told investors that its discussions with the DOJ and SEC had "progressed to a point where we are now able to reasonably estimate a probable loss and have recorded an accrual of $28 million in our financial statements in Q3." In its Form 10-Q filed the next day, the Company further disclosed that it had "substantially completed" its internal investigation. In its 2018 Form 10-K, the Company stated that it had incurred a total of *$79 million* in costs related to the investigation, excluding the $28 million paid to the SEC and DOJ.

187.   On February 6, 2019, in connection with its earnings release, Cognizant announced what the *International Business Times* called a "major management shake-up." D'Souza—who co-founded Cognizant in 1994 and had been CEO since 2007—would be stepping down from Cognizant in April 2019, to be replaced by Vodafone executive Brian Humphries. Humphries will be the first outsider to become CEO in the Company's history. In addition, the Company also announced that Rajeev Mehta—who had served as Cognizant's President since the Company fired Coburn in September 2016—would also be stepping down from Cognizant in April 2019.

188.   On February 14, 2019—and made publicly available the following day—the United States Attorney for the District of New Jersey filed the Indictment, in which a federal grand jury sitting in Newark, New Jersey, charged

Defendants Coburn and Schwartz with 12 criminal counts related to the bribery scheme.

189.   The same day that the Indictment became public—February 15, 2019—the SEC filed the SEC Action, alleging civil claims against Defendants Coburn and Schwartz for violations of the FCPA and securities laws in connection with the bribery scheme.

190.   Also that day, the SEC separately announced the SEC Order, in which Cognizant agreed to pay $25 million to settle claims that it had violated the securities laws in connection with the bribery scheme; cease-and-desist future violations; and report to the SEC periodically for two years on its remediation and implementation of enhanced compliance measures, including through periodic reviews by SEC Staff and the submission of written reports to the SEC.

191.   On February 19, 2019, *The Economic Times* reported that Cognizant may still be liable for wrongdoing under Indian law.[71] That same day, the President of the Indian political party Dravida Munnetra Kazhagam, M.K. Stalin, demanded the registration of a case against Cognizant for the bribery scheme. Stalin also urged the India Central Bureau of Investigation and Interpol to obtain evidence, and further demanded that the government should assist the state's Directorate of

---

[71] ET Bureau, *DMK seeks probe against former AIADMK ministers*, The Economic Times, (Feb. 16, 2019), https://economictimes.indiatimes.com/news/politics-and-nation/dmk-seeks-probeagainst-former-aiadmk-ministers/articleshow/68059327.cms.

Vigilance and Anti-Corruption in acquiring evidence against Cognizant from the United States.[72]

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD

192.   During the Relevant Period Defendants made numerous statements regarding Cognizant's business and results of operations that were materially false and misleading in light of the Company's misconduct, namely, the undisclosed bribery scheme. **First**, in the Company's SEC filings, Defendants informed investors of the financial benefits Cognizant received from its SEZ licenses without revealing that the Company was engaged in a bribery scheme in order to obtain and perpetuate those benefits. The Company also reported the investments it made in its SEZs – figures that were overstated because they included several million dollars worth of illicit payments to Indian government officials. **Second**, Defendants claimed that Cognizant had established robust policies and procedures to ensure legal and ethical compliance, including extensive training and "risk analysis" functions to assess and prevent "corruption." Based on these representations, Defendants specifically stated that "no" "confirmed incidents" of "corruption" had been "reported in 2014" or "in 2015." Defendants also stated that "no incidents" of "significant risks" of "corruption" had been reported "in 2015."

---

[72] *Id.*

These representations were materially false and misleading in light of the facts that (1) Cognizant was involved in a bribery scheme in India; (2) the scheme was facilitated by senior management, including the Company's President and Chief Legal Officer, overriding or failing to enforce the much-hyped internal controls; and (3) Cognizant has admitted that, in truth, its internal controls were materially deficient. **Third**, Defendants represented that Cognizant's financial performance and ability to deliver low-cost services were due to legitimate business factors without revealing that the Company was achieving its success, at least in part, through bribes to Indian government officials. **Fourth**, Defendants overstated Cognizant's earnings during the Relevant Period by incorrectly booking its bribe payments as capital expenditures when, in fact, those payments should have been booked as operating expenses and charged against the Company's net income. **Finally**, the Company reported in its SEC filings that its internal controls were "effective" when, as the Company has now admitted, those controls and its "tone at the top" were materially defective due to senior management's overriding the controls or knowingly allowing them to be breached in order to facilitate the bribery scheme.

      **A.    Cognizant Highlighted the Benefits It Received from Its SEZ Licenses in India Without Disclosing that the Company was Involved in a Bribery Scheme to Obtain and Perpetuate Those Benefits**

193.   During the Relevant Period, Defendants repeatedly highlighted the "significant" tax benefits and "relaxed . . . regulatory restrictions" that Cognizant received from the Indian government because many of its operations were located in India's SEZs. Defendants emphasized that these benefits materially "increase[d] net income." These statements were materially false and misleading when made because Cognizant obtained those benefits in material part through the scheme to bribe Indian officials for SEZ permits.

194.   On February 27, 2015, Cognizant filed its 2014 Form 10-K with the SEC, which was signed by D'Souza and McLoughlin (and others). The 2014 Form 10-K described the "income tax holiday benefits" that Cognizant's "Indian subsidiaries" had received from the "Indian government" as follows:

> ***Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years.*** Changes in Indian tax laws that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition.

195.   The 2014 Form 10-K qualified the "effect of the income tax holidays granted by the Indian government" as follows:

> For the years ended December 31, 2014, 2013, and 2012, the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and ***increase net income by approximately[in thousands] $182,973, $146,326, and $151,789, respectively, and increase diluted EPS by $0.30, $0.24, and $0.25, respectively.***

196.   Cognizant also reported that, ***"[a]s of December 31, 2014, we had outstanding fixed capital commitments of approximately $20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers."*** The 2014 Form 10-K further stated, ***"[w]e have constructed and expect to continue to locate most of our newer development facilities in SEZs."***

197.   The above statements made in the 2014 Form 10-K were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits" that the Company received from the "Indian government" when, in fact, the Company was obtaining those benefits through the bribery scheme detailed herein. Similarly, it was materially false and misleading for Cognizant to state that the SEZ facilities meaningfully ***"increase net income . . . and increase diluted EPS"*** when the Company was obtaining such benefits through the bribery scheme detailed herein. It also was materially false and misleading for Cognizant to state that it had ***"outstanding fixed capital commitments of approximately $20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers,"*** when that figure included at least $4.1 million in bribes paid to government officials.

198.  It also was misleading for Cognizant to state that it would "locate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme detailed herein.

199.  On May 4, 2015, Cognizant filed its Q1 2015 Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and stated, in part: ***"Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."*** Cognizant also reported that, in response to the factors and risks affecting its business and operating results, the Company planned to ***"[l]ocate most of our new development center facilities in tax incentivized areas."***

200.  The above statements made in the Q1 2015 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.

201.  It also was misleading for Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when

Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

202.   On August 6, 2015, Cognizant filed a Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and that stated, in part: ***"Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."*** Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to ***"[l]ocate most of our new development center facilities in tax incentivized areas."***

203.   The above statements made in the Q2 2015 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining such benefits through the bribery scheme detailed herein.

204.   It also was misleading for Cognizant to state that it would "[l]ocate most of our new development facilities in tax incentivized areas," when Cognizant

was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

205.   On November 5, 2015, Cognizant filed a Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and that stated, in part: ***"Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."*** Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to ***"[l]ocate most of our new development center facilities in tax incentivized areas."***

206.   The above statements made in the Q3 2015 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.

207.   It also was misleading for Cognizant to state that it would "[l]ocate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

208.   On February 25, 2016, Cognizant filed a 2015 Form 10-K with the SEC that was signed by D'Souza and McLoughlin, among others. The 2015 Form 10-K touted the "income tax holiday benefits" that Cognizant's "Indian subsidiaries" had received from the "Indian government":

> *Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years.* [If enacted, proposed changes in Indian tax laws] that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition.

209.   The 2015 Form 10-K quantified the "effect of the income tax holidays granted by the Indian government" as follows:

> *For the years ended December 31, 2015, 2014 and 2013, the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately $201.4 million, $183.0 million and $146.3 million, respectively, and increase diluted EPS by $0.33, $0.30 and $0.24, respectively.*

210.   Cognizant also reported that, *"[a]s of December 31, 2015, we had outstanding fixed capital commitments of approximately $76.4 million related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers." The 2015 Form 10-K also stated, "We have constructed and expect to continue to operate most of our newer development facilities in SEZs."*

211.   The above statements made in the 2015 Form 10-K were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "significant tax incentives" from the "Indian government" and related "benefits realized by us from Indian operations" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein. Similarly, it was materially false and misleading for Cognizant to state that the SEZ facilities meaningfully "*increase net income* . . . *and increase diluted EPS*" when the Company was obtaining such benefits through the bribery scheme detailed herein. It also was materially false and misleading for Cognizant to state that it had "*outstanding fixed capital commitments of approximately $76.4 million related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers,*" when that figure included at least $4.1 million in bribes paid to government officials.

212.   It also was misleading for Cognizant to state that it would "continue to operate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

213.   On May 6, 2016, the Company filed a Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and that stated, in part: "*Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-*

*oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."* Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to *"[l]ocate most of our new development center facilities in tax incentivized areas."* Cognizant also reported that, *"[a]s of March 31, 2016, we had outstanding fixed capital commitments of approximately $76.2 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."*

214.   The above statements made in the Q1 2016 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein. It also was materially false and misleading for Cognizant to state that it had "outstanding fixed capital commitments of approximately $76.2 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers" when that figure included at least $4.1 million in bribes paid to government officials.

215.   It also was misleading for Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

216.   On August 5, 2016, the Company filed a Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and that stated, in part: ***"Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."*** Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to ***"[l]ocate most of our new development center facilities in tax incentivized areas." Cognizant also report that, "[a]s of June 30, 2016, we had outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."***

217.  The above statements made in the Q2 2016 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had

received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein. It also was materially false and misleading for Cognizant to state that it had "outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers" when that figure included at least $4.1 million in bribes paid to government officials.

218.   It also was misleading for Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

## B.   Cognizant Emphasized Its Legal Compliance and Internal "Anti-Corruption" Controls While Specifically Denying Any "Incident" of "Corruption" During 2014 or 2015

219.   During the Relevant Period, Defendants stated that Cognizant did not offer payments to government officials to obtain anything of value. Defendants further stated that Cognizant had established robust policies and procedures to ensure legal and ethical compliance, including extensive training and "risk analysis" functions to assess and prevent "corruption." Based on these representations, Defendants specifically stated that "no" "confirmed incidents" of "corruption" had been "reported in 2014" or "in 2015." Defendants also stated that "no incidents" of "significant risks" of "corruption" had been reported "in 2015."

As explained below, these statements were materially false and misleading when made because Cognizant and its "senior management" were engaged in the bribery scheme detailed above.

### 1.    Defendants' False Statements in the Anticorruption Policy

220.   Throughout the Relevant Period, Cognizant published and disseminated its Anticorruption Policy to investors through its website.

221.   The Anticorruption Policy stated that the Company would:

- *"never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual in order to obtain business for the Company or to secure an improper advantage for the Company";*

- *"never permit, allow, authorize (or turn a 'blind eye' to) a Company third-party's representative payment, promise, offer or authorization of a bribe or anything of value to a government official or any other individual in order to win business or obtain improper advantages for the Company";*

- *"consult with our Legal Department before offering or giving anything of value, even of nominal value (e.g., for meal or dinner, or sports tickets), to a government official or to someone who is in a position to influence a government official or a third-party representative, as governed by our Core Values and Standards of Business Conduct regarding gifts and entertainment";*

- *"ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed when making payments from the Company"; and*

- *"comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests, particularly those payments related to the Company's sales, marketing, and business development efforts, consistent with our Core Values and Standards of Business Conduct on transparency."*

222.   The Anticorruption Policy further assured investors that Cognizant was taking a number of additional concrete steps to ensure the Company's compliance with anticorruption laws. Among other things, Cognizant told investors that all employees involved in procurement and contracting, as well as *"[k]ey business partners and third-party representatives," would "receive appropriate training from the Company"* regarding compliance with anticorruption laws. The Company also represented that its Legal Department would review "red flag" transactions, including those transaction involving a government-related counterparty. Moreover, Cognizant stated that *"periodic audits of compliance shall be performed by each business unit in coordination with our Legal Department" in order to "[m]onitor and [a]udit [c]ompliance [w]ith [the] Anticorruption Policy."*

223.   The above statements made by Cognizant in the Anticorruption Policy were materially false and misleading when made. It was misleading for Defendants to state that the Company would "never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual" in order to "to secure an improper advantage for the Company," or permit a Company

"representative" to do so, when as alleged above, the Company and its representatives paid bribes to Indian officials in order to secure SEZ licensing for Cognizant's Indian operations, with the knowledge and participation of senior Company management.

224.   It was further misleading for Defendants to represent that the Company had established and followed a robust and comprehensive system of FCPA compliance mechanisms when in fact, Defendants knowingly eschewed compliance with the FCPA and the Company's Anticorruption Policy because they were engaged in a scheme to bribe Indian government officials. Among other things, it was misleading for Defendants to represent that the Company would "ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed," and that Cognizant would "comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests" when, as alleged above: (1) the Company's books and records were misstated, as the improper payments to Indian officials were inappropriately recorded and inappropriately capitalized in the Company's financial statements; (2) senior management actually overrode the Company's internal controls and thus Cognizant did not maintain an appropriate "tone at the top"; and (3) Company policies concerning "documentation of

expenses," including flagging payments to foreign officials and vetting them with Cognizant's Legal Department, were not followed.

225.  It also was misleading for Defendants to state that Cognizant employees and "[k]ey business partners and third-party representatives" with procurement-related responsibility would "receive appropriate training from the Company" regarding compliance with anticorruption laws when, as reported by numerous former Cognizant employees, adequate training was not provided.

226.  Finally, it was misleading for Defendants to tout Cognizant's "periodic audits" to "[m]onitor and [a]udit [c]ompliance [w]ith [the] Anticorruption Policy" when: (1) the Company failed to undertake any such audit for years prior to 2014; and (2) the Company's first FCPA compliance audit undertaken at the end of 2014 had uncovered evidence of bribes and several "high risk" problems in Cognizant's internal controls, yet these findings were not acted upon.

**2.    Defendants' False Statements in the 2014 Sustainability Report**

227.  In June 2015, Cognizant published and disseminated to investors through its website its 2014 Sustainability Report. In this report, Cognizant stated that it had performed thorough audits of anticorruption compliance and had discovered "no incidents" of corruption. Moreover, the Company claimed that it provided "role based anti-corruption training" to Cognizant employees:

***SO 3 Training on Anti-Corruption.***

***In 2014, we introduced role based anti-corruption training to supplement the anti-corruption provisions of the general ethics training our employees received. We delivered 331,114 hours of Code of Ethics training through eLearning in 2014. We also delivered live Code of Ethics trainings to targeted audiences of over 18,000 associates in India and the Philippines. Our formal learning was supplemented in 2014 by education campaigns featuring games, quizzes and prizes.***

***Additionally, our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption.***

***SO4 Actions taken in response to incidents of corruption.***

***No incidents reported in 2014.[73]***

228.   The above statements in Cognizant's 2014 Sustainability Report were materially false and misleading when made. It was misleading for Defendants to state that "no incidents" of "corruption" had been reported in 2014, when, among other things: (1) the Company's President, Chief Legal Officer, and other members of senior management were involved in the bribery scheme detailed herein, and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of the Company's bribery already had been reported to senior Cognizant personnel at the time this report was published; and (3) Cognizant's senior

---

[73] Cognizant, *2014 Sustainability Report – Building New Tomorrows*, at 55.

management participated in making the corrupt payments by overriding and/or failing to enforce the Company's internal financial controls designed to detect, report, and prevent such bribes.

229.   It was further misleading for Defendants to state that extensive "anti-corruption training" had been provided to Cognizant employees, when, as reported by former Cognizant personnel, no adequate anticorruption compliance training was provided to Company personnel.

### 3.   Defendants' False Statements in the Code of Conduct

230.   From the start of the Relevant Period until approximately May 30, 2015, Defendants published and disseminated Cognizant's Code of Conduct to investors through Cognizant's website. The Code of Conduct stated that the Company does not ***"[g]et involved with middlemen and/or the bribing of government officials while procuring or leasing land and infrastructure."[74]*** The Code of Conduct further stated:

**We must not:**

- Accept or permit any member of our immediate family to accept any gifts, gratuities or other favors from any customer, supplier or other person doing or seeking to do business with the Company, other than items of nominal value or items that do not exceed local social and/or business customs.

- Give gifts outside of standard business practices in hopes of influencing a business decision.

---

[74] *Cognizant's Core Values and Standards of Business Conduct*, at 16 (2013).

- Give Company funds or assets for gifts, gratuities or other favors to government officials.

- **Bribes and Kickbacks**

  Bribes and kickbacks are criminal acts, strictly prohibited by law. As Cognizant Associates we must never offer, give, solicit or receive any form of bribe or kickback anywhere in the world.[75]

231.   On or around July 5, 2015, Cognizant published a revised version of its Code of Conduct. This document remains on the Company's website and contains a message from D'Souza:

> I have said many times that the easy way is not the Cognizant way. We do not cut corners, bend the rules, or look for shortcuts—and we *have a zero-tolerance policy toward those who do*.[76]

232.   The revised Code of Conduct further states, in explicit terms, that the Company complies with "all applicable anti-corruption laws":

> *This means, in part, that we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business.*
>
> *We do not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company.*[77]

---

[75] *Id.* at 29.

[76] *Cognizant's Core Values and Standards of Business Conduct* (2015).

[77] *Id.*

233.   The above representations in Cognizant's Codes of Conduct were materially false and misleading when made. It was misleading for Defendants to state that the Company was "comply[ing] with all applicable anti-corruption laws," did "not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company," and did not "[g]et involved with middlemen and/or the bribing of government officials while procuring or leasing land and infrastructure," because, as alleged above, Cognizant was engaged in a scheme to bribe Indian government officials in exchange for SEZ licenses for the Company's facilities in India. It was further misleading for Defendants to state that the Company had "a zero-tolerance policy toward those who" fail to comply with Cognizant's anticorruption policies because, as the Company has admitted, its own senior management officials overrode and/or failed to enforce Cognizant's internal financial controls in order to facilitate the bribery scheme.

### 4.   Defendants False Statements in the 2015 Sustainability Report

234.   In August 2016, the Company published its 2015 Sustainability Report. This report stated:

> **G4-56 The organization's values, principles, standards and norms of behavior such as codes of conduct and codes of ethics.** As a global business, Cognizant is committed to complying with the laws of the countries in which we operate. . . .

. . . .

***Cognizant treats reports of misconduct seriously.*** All reports are reviewed by the Chief Compliance Officer, who appoints a responsible person as appropriate to conduct an informal inquiry or a formal investigation. If a violation of our Standards has occurred, appropriate disciplinary action will be taken against individuals involved as permitted by local laws. Additional steps will be taken if an alleged violation involves an Executive Officer or Board Member.

Today's dynamic global marketplace demands that we achieve the highest standards of behavior. It is therefore critical that all of us at Cognizant make business decisions that align with our ethical principles. ***This means, in part, that we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business.***[78]

. . . .

## SUB-CATEGORY: SOCIETY

### Aspect: Anti-corruption

### G4-SO3 Total number and percentage of operations assessed for risks related to corruption and the significant risks identified

***There were no incidents reported in 2015.***

### G4-SO4 Communication and training on anti-corruption policies and procedures

We delivered 689,288 hours of Code of Ethics training through eLearning in 2015. We also delivered live Code of Ethics trainings to targeted audiences of over 203,947 associates in India. Our formal learning was supplemented in 2015 by education campaigns featuring games, quizzes and prizes. The percentage of Associates completing the online Code of Ethics training was 94%. Anti-Corruption training was provided for 500 hours and delivered for selected associates in

---

[78] Cognizant, *2015 Sustainability Report – Helping People Navigate the Digital Shift*, at 50.

Administration, Procurement, Sales & Marketing, Finance and other support Functions.

Additionally, our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption.

### G4-SO5 Confirmed incidents of corruption and actions taken
***There were no incidents reported in 2015.[79]***

235. It was misleading for Defendants to state that Cognizant had performed a thorough audit of the Company's anticorruption compliance and that "[t]here were no incidents reported in 2015" of "corruption," or even "significant risks" of "corruption," and that "we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business," when, among other things: (1) the Company's President, Chief Legal Officer and other members of senior management were involved in the bribery scheme detailed herein, and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of the Company's bribery had already been reported to senior Cognizant personnel at the time this report was published; and (3) Cognizant's senior management participated in making the corrupt payments by overriding and/or failing to enforce the Company's internal financial controls designed to detect, report and prevent such bribes.

---

[79] *Id.* at 60.

236.   Additionally, it was misleading for Defendants to state that "Cognizant treats reports of misconduct seriously" and that "Cognizant is committed to complying with the laws of the countries in which we operate," because the Company's senior management overrode and/or failed to enforce Cognizant's internal financial controls in order to facilitate the bribery scheme.

237.   It was further misleading for Defendants to tout the anticorruption training provided to Company personnel, when, as described above, no adequate anticorruption compliance training was provided.

**C.     Cognizant Touted Its Ability to Deliver Low-Cost Services to Clients Through Legitimate Means, and Attributed the Company's Financial Results to Legitimate Business Factors and Conditions**

238.   Throughout the Relevant Period, Defendants attributed Cognizant's financial results to a variety of legitimate "key" business factors and conditions. Defendants also touted Cognizant's ability to achieve "organic growth" in its "core business" of IT and business process outsourcing by lowering client costs through the Company's supposedly legitimate operations in India. Defendants also repeatedly attributed Cognizant's revenue growth from its "Rest of World customers" primarily to its supposedly legitimate Indian operations. As explained below, these statements were materially false and misleading when made because, unbeknownst to investors, Cognizant's performance, including its ability to deliver cost savings to its clients, was driven, in material part, by the Company's scheme

to bribe Indian officials in order to secure SEZ permits for its Indian operations. In Cognizant's 2014 Form 10-K, filed February 27, 2015, and signed by, among others, D'Souza and McLoughlin, Defendants stated, ***"In 2014, our revenue increased to $10,262.7 million compared to $8,843.2 million in 2013."*** Cognizant's 2014 Form 10-K further stated that the ***"key drivers of our revenue growth in 2014"*** were: ***"[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and BPS services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of the market for global delivery of IT services and BPS."***

239.   The above statements in Cognizant's 2014 Form 10-K were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's revenue growth to legitimate business factors and conditions, including the "[e]xpansion of our service offerings" and "[c]ontinued expansion of the market for global delivery of IT services and BPS," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

240.   On May 4, 2015, Cognizant issued a press release, also incorporated in the Form 8-K filed with the SEC on the same date, setting forth its financial results for Q1 2015. The press release quoted McLoughlin as attributing Cognizant's "strong" financial performance to the "organic growth of our core business": "***Our strong revenue performance this quarter versus our guidance was driven primarily by organic growth of our core businesses*** and is a reflection that our strategy and offerings are resonating with our clients."

241.   The above statements made by McLoughlin in the May 4, 2015 press release and the Form 8-K were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's "strong" financial performance to legitimate business factors and conditions, including the "organic growth" of the Company's "core business," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

242.   On May 4, 2015, the Company filed its Q1 2015 Form 10-Q with the SEC. As noted above, that filing was signed by D'Souza and McLoughlin. In the Form 10-Q, Cognizant stated, "***For the three months ended March 31, 2015, our revenue increased to $2,911.4 million compared to $2,422.3 million for the three months ended March 31, 2014.***" Cognizant's 1Q 2015 Form 10-Q further stated that the "***key drivers of our revenue growth during the three months ended***

*March 31, 2015"* were: *"[o]ur November 2014 acquisition of TZ US Parent, Inc., or TriZetto"; "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting, infrastructure services, and business process services"; "[i]ncreased penetration at existing customers";* and *"[c]ontinued expansion of the market for global delivery of IT services and business process services."*

243.   Cognizant's Q1 2015 Form 10-Q further reported that, "*[t]he revenue growth from our Rest of World customers in 2015 was primarily driven by the India*, Japan, Australia, Hong Kong, and Singapore markets and include[d] a negative currency impact of 5.8%."

244.   The above statements made in the Q1 2015 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and "penetration of the Rest of World . . . markets," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to

obtain SEZ licensing by bribing Indian government officials. It also was materially false and misleading for Defendants to attribute Cognizant's financial performance to revenue growth "from our Rest of World customers in 2015," including India, when the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

245.   Also on May 4, 2015, Cognizant hosted its Q1 2015 earnings conference call, during which Defendant Coburn stated: "Finally, we saw good traction in the rest of the world which was up 7.6% sequentially after a 2.8% negative currency impact. ***Growth was driven primarily by strength in key markets such as India and the Middle East.***"

246.   Also during the call, D'Souza stated: ***"Our sequential growth was well ahead of our previous guidance and was driven by strong organic growth in our core business coupled with solid in-line performance in the TriZetto business."***

247.   The above statements made by Defendant Coburn and D'Souza during the Q1 2015 earnings conference call were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including "strong organic growth in our core business coupled with solid in-line performance in the

TriZetto business" and "strength in key markets such as India" when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

248.   The   market   readily   believed   Defendants.   Analysts   repeated management's statements attributing Cognizant's "strength" to India. For example, on May 4, 2015, UBS published a report stating: "Cognizant provides a mix of application management and application development solutions **using an on-site/offshore business model centered on its India-based development centers**."

249.   On May 4, 2015, William Blair and Company, L.L.C. published a report stating: "Significant growth in the rest of the world geography was driven by India and the Middle East."

250.   Consistent with the positive statements made by Coburn and D'Souza regarding Cognizant's strong organic growth driven by strength in key markets such as India, Cognizant's stock price increased from an opening price of $58.65 per share on May 1, 2015, to a closing price of $62.78 per share on May 4, 2015, an increase of approximately 7%.

251.   In June 2015, analysts continued to discuss Cognizant's cost-cutting measures in India. On June 10, 2015, Wells Fargo Securities published an analyst report stating: "An article in the India press (Economic Times) indicates that

[Cognizant] is 'taking a series of steps to rein in costs and meet its operating margin target' according to their sources."

252.   On June 30, 2015, Jefferies published an analyst report stating:

[Cognizant] seemed confident in maintaining operating margins in the target range. Following an Indian news media article speculating that [Cognizant] is undertaking cost-cutting measures to maintain its operating margins, [Cognizant] management indicated that it remains confident in maintaining its adjusted operating margins in the 19-20% target range and is not undertaking any out of the ordinary cost rationalization measures.

253.   On July 27, 2015, Deutsche Bank Markets Research published an analyst report stating: "[Rest of world] was up . . . with **growth being driven primarily by strength in key markets such as India** and the Middle East."

254.   On August 5, 2015, Cognizant held its Q2 2015 earnings conference call with analysts and investors. During the call, Defendant Coburn stated: "Finally, we saw continued strong traction in the Rest of World, which was up 10.7% sequentially. ***Growth was driven primarily by strength in markets such as India*** and Australia."

255.   The above statement made by Defendant Coburn during the Q2 2015 earnings call was materially false and misleading when made. It was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including strength in markets such as India, when, in fact,

the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

256.   Analysts again reacted positively to Defendants' statements. On August 5, 2015, Société Générale published a report noting that "Cognizant is picking up momentum in newer geographies like India and Australia where it had little presence even two years ago."

257.   Also on August 5, 2015, SIG Susquehanna Financial Group, LLLP published an analyst report stating: "Rest of the world also rose 10.7% sequentially, driven by strong demand in India and Australia."

258.   Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions to those statements, Cognizant's stock price increased from an opening price of $63.06 per share on August 4, 2016, to a closing price of $67.34 per share on August 5, 2016, an increase of nearly 7%.

259.   On August 6, 2015, Cognizant filed its Q2 2015 Form 10-Q with the SEC. As noted above, that filing was signed by D'Souza and McLoughlin. Cognizant's Q2 2015 Form 10-Q stated, ***"For the three and six months ended June 30, 2015, our revenue increased to $3,085.1 million and $5,996.5 million compared to $2,517.1 million and $4,939.4 million for the three and six months ended June 30, 2014, respectively."*** Cognizant's Q2 2015 Form 10-Q further

stated that the ***"key drivers of our revenue growth during the three months ended June 30, 2015"*** were: ***"[o]ur November 2014 acquisition of TZ US Parent, Inc., or TriZetto"; "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting, infrastructure services, and business process services"; "[i]ncreased penetration at existing customers";*** and ***"[c]ontinued expansion of the market for global delivery of IT and business process services."***

260.   The Company in its Q2 2015 Form 10-Q further reported: ***"Revenue grew 30.0% from our Rest of World customers in the second quarter of 2015 . . . and was primarily driven by the India*** and Australia markets." Cognizant further noted: ***"The revenue growth from our Rest of World customers in the first half of 2015 grew 27.0% . . . and was primarily driven by the India***, Australia and Japan markets."

261.   The above statements made in the Q2 2015 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued

expansion of the market for global delivery of IT and business process services," and revenue growth from "Rest of World customers," such as India, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

262.   On October 15, 2015, Cantor Fitzgerald published an analyst report stating: "[Cognizant] continued to expand in other key regional markets, including India, Singapore, Australia, Japan and Hong Kong, with revenues increasing 23.6% over the prior year."

263.   On November 4, 2015, Cognizant held its 2015 third quarter earnings call with analysts and investors. During this call, Defendant Coburn and D'Souza responded to an analyst's question about pressure on revenue growth in its "traditional" IT and business operations outsource business based in India. Defendants responded by stating that Cognizant continued to "take market share on the maintenance side" by "lowering cost" to help customers "become more efficient":

> [Analyst]: The question really is, **what sort of pressure are you seeing on revenue growth on the traditional side?** . . . And how does it change your notion of revenue visibility and impact on margins?
>
> [**Coburn**]: . . . I think you're right that **clients are trying to fund spending on innovation and on digital by optimizing the cost on run the business, which a lot of that is the traditional outsourcing**. And you've seen that in our numbers now for many quarters, where

our technology and consulting business is growing faster than the outsourcing business.

But let's be clear. *We continue to do very well and take market share on the maintenance side. What customers are looking for is they're interested in how can we become more efficient, lower their cost of ownership on maintenance, so they can free up those dollars to move elsewhere. And we – Cognizant just has this incredible track record of delivering very high quality services, while continuously delivering productivity and efficiency.*

*So I think we're probably better positioned than most others in the market in terms of lowering cost of ownership on maintenance . . . .*

*. . . .*

*. . . [D'Souza]: . . . I would say that the bulk of the productivity that we drive in the core business is through traditional means of driving productivity and efficiency that includes process kinds of things like Lean and Six Sigma and so on, and also more traditional tools in automation.*

264.  Also, during this call, Coburn stated, *"We're going to continue with the strategy that we've been executing successfully on, which is making long-term organic investments is the key – the core of our business."*

265.  The above statements made by Defendant Coburn and D'Souza during the Q3 2015 earnings conference call were materially false and misleading when made. Specifically, it was materially false and misleading for D'Souza to attribute the Company's success in its "core business" to legitimate business factors and conditions, such as lowering cost through "traditional means of driving productivity and efficiency," when, in fact, Cognizant's efforts to lower costs were

accomplished in part by bribes paid to Indian government officials in exchange for SEZ licenses.

266.   Similarly, it was materially false and misleading for Coburn to state that the Company's "core" "strategy that we've been executing successfully on" was "making long-term organic investments," when in fact, Cognizant's strategy and financial performance were driven in part by bribes paid to Indian government officials in exchange for SEZ licenses for the Company's facilities in India. It also was materially false and misleading for Coburn to state that the Company's ability to "take market share" was driven by legitimate factors, such as its ability to lower "cost of ownership" and the Company's "incredible track record of delivering very high quality services, while continuously delivering productivity and efficiency," when Cognizant's performance was driven, in part, by bribes paid to Indian government officials in exchange for SEZ licenses.

267.   On November 5, 2015, the Company filed a Form 10-Q with the SEC. As noted above, that filing was signed by D'Souza and McLoughlin. Cognizant's Q3 2015 Form 10-Q stated, ***"For the three and nine months ended September 30, 2015, our revenue increased to $3,187.0 million and $9,183.5 million compared to $2,581.0 million and $7,520.5 million for the three and nine months ended September 30, 2014, respectively."*** Cognizant's Q3 2015 Form 10-Q further stated that the ***"key drivers of our revenue growth during the three months ended***

*September 30, 2015" were: "[o]ur November 2014 acquisition of TZ US Parent, Inc., or TriZetto"; "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting, infrastructure services, and business process service"; "[i]ncreased penetration at existing customers";* and *"[c]ontinued expansion of the market for global delivery of IT and business process services."*

268.   Cognizant's Q3 2015 Form 10-Q further reported: ***"Revenue grew 31.0% from our Rest of World customers in the third quarter of 2015 . . . and was primarily driven by the India***, Singapore and Australia markets."

269.   The above statements made in the Q3 2015 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and penetration of the Rest of World markets, such as India, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

270.   On February 8, 2016, Cognizant held its 2015 fourth quarter earnings call with analysts and investors. During this call, Coburn stated:

Finally, we saw continued strong traction in the rest of the world, which was up by 6.8% sequentially and 34% year over year. ***Growth was driven primarily by strengths in key markets such as India, Singapore and the Middle East where we're seeing good traction with clients' adoption of digital technologies.***

271.   The above statement made by Defendant Coburn during the Q4 2015 earnings conference call was materially false and misleading when made. It was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including strength in "key markets such as India" where it had seen "good traction with clients' adoption of digital technologies," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

272.   Following the Q4 2015 earnings call, numerous analysts cited Coburn's statement emphasizing growth driven by the Indian market. For example, on February 8, 2016, Evercore ISI published a report stating: "[Cognizant] generated revenue growth of 19% for North America, while Rest of World revenue advanced 34% led by India, Singapore and the Middle East given strong demand for digital technologies."

273.   Also on February 8, 2016, Barclays published a report stating: "**Rest of World**: RoW grew 6.8% Q/Q and 34% Y/Y. Growth was primarily driven by strengthen in key markets including India, Singapore, and the Middle East."

274.   Nomura published a report on February 8, 2016, stating: "Growth in the ROW was driven by strength in markets such as India, Singapore, and the Middle East."

275.   That same day, Oppenheimer published an analyst report stating: "Rest of World (~6% of revenue) led all geographic segments with strong 6.8% Q/Q growth to ~$179M, driven by strength in India, Singapore, and the Middle East."

276.   On February 25, 2016, the Company filed a Form 10-K with the SEC that was signed by D'Souza and McLoughlin, among others. In that filing, Cognizant reported revenue of *$12,416 million*, an increase over the previous year's revenue of $10,262.7 million. Cognizant's 2015 Form 10-K further stated that the *"key drivers of our revenue growth"* during the three months ended March 31, 2015 were: *"[o]ur November 2014 acquisition of TZ US Parent Inc., or TriZetto"; "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our*

*service offerings, including consulting, infrastructure services, and business process services"; "[i]ncreased penetration at existing customers";* and *"[c]ontinued expansion of the market for global delivery of IT and business process services."*

277.   Cognizant's 2015 Form 10-K further reported, "In 2015, revenue from our Rest of World customers grew 29.9%, after a negative currency impact of 9.2%. In 2014, revenue from our Rest of World customers grew 23.6%. In 2015 and 2014, *growth was primarily driven by the India*, Singapore, Australia, Japan and Hong Kong markets."

278.   The above statements made in the 2015 Form 10-K were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and "revenue from our Rest of World" customers and growth in the Indian market, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

279.   On May 6, 2016, Cognizant filed a Form 10-Q with the SEC. As noted above, that filing was signed by D'Souza and McLoughlin. The Form 10-Q reported revenue for the three months ended March 31, 2016 of $3,202 million, an

increase over first quarter 2015 revenue of $2,911.4 million. Cognizant's Q1 2016 Form 10-Q further stated that the ***"key drivers of our revenue growth during the three months ended March 31, 2016"*** were: ***"[s]olid performance across our Financial Services, Manufacturing/Retail/Logistics and Other business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting and digital services"; "[c]ontinued expansion of the market for global delivery of IT and business process services";*** and ***"[i]ncreased penetration at existing customers."***

280.   Cognizant's Q1 2016 Form 10-Q further reported that "[r]evenue from our Rest of World customers increased 24.9% . . . as compared to the quarter ended March 31, 2015." Cognizant further reported: ***"Revenue from our Rest of World customers grew 24.9% . . . in the first quarter of 2016, and was primarily driven by the India***, Singapore and Australia markets."

281.   The above statements made in the Q1 2016 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services,"

and penetration of the Rest of World market, and India specifically, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

282.   Also on May 6, 2016, Cognizant held its Q1 2016 earnings call with analysts and investors. During this call, D'Souza described the Company's "strategic initiative" to "achieve new levels of efficiency" for "clients" in their "core transaction processing operations":

> *The second strategic initiative is to help clients achieve new levels of efficiency and effectiveness in their core transaction processing operations by building platform-based solutions and industry utilities. . . . By applying a series of levers including process optimization, digitization and large-scale efficiencies, we're able to bring clients levels of effectiveness which they would have been unable to reach on their own.*

283.   During this call, Coburn also attributed the Company's strong retail and manufacturing results to "growing" client relationships and Cognizant's ability to "leverage" its technical expertise in "retail, manufacturing and logistics." Coburn added: "[T]he rest of the world was up 30 basis points sequentially, and almost 25% year-over-year. *Growth was driven primarily by strength in key markets such as India*, Australia and the Middle East where we're seeing good traction with client's adoption of digital technologies."

284.   The above statements made by D'Souza and Coburn during the Q1 2016 earnings call were materially false and misleading when made. It was

misleading for D'Souza to attribute Cognizant's ability to deliver lower cost IT services to clients to wholly legitimate business factors and conditions, such as "applying a series of levers including process optimization, digitization and large-scale efficiencies," when, in fact, Cognizant's ability to deliver cost savings to its clients was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

285.   Likewise, it was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including "growing" client relationships and Cognizant's ability to "leverage" its technical expertise in "retail, manufacturing and logistics," and growth in the Indian market, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

286.   The market accepted Defendants' statements. On May 6, 2016, an S&P Capital analyst report stated: "We think cost-cutting initiatives will be a source of strength for the India-based outsourcing companies in the group."

287.   Also on May 6, 2016, Oppenheimer published an analyst report stating: "Rest of World revenue (~6% of total revenue) grew a lackluster 0.3% Q/Q to ~$179M, driven by India, Australia, and the Middle East."

288.   That same day, William Blair stated in its analyst report: "From a geographic point of view, significant growth in the rest of the world was driven by India, Australia, and the Middle East, with management citing especially good traction and opportunity within digital."

289.   Similarly, Barclays published an analyst report on May 9, 2016 stating: **"Rest of World: RoW grew 0.3% Q/Q and almost 25% Y/Y. Growth was primarily driven by strength in key markets including India**, Australia, and the Middle East due to adoption of digital technologies."

290.   Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions to those statements, Cognizant's stock price increased from an opening price of $57.50 per share on May 5, 2016, to a closing price of $60.55 per share on May 6, 2016, an increase of approximately 5%.

291.   On May 24, 2016, Defendant Coburn attended the J.P. Morgan Technology, Media and Telecom Conference, at which he spoke to analysts and investors. During the conference, Coburn noted that Cognizant had seen "intense pressure" from its customers "to squeeze costs" and "to reduce cost of ownership." In this context, Coburn touted Cognizant's ability to respond to the customer demand by ***"bring[ing] best practices to our clients for our traditional services,***

*constantly lower[ing] their cost of ownership while maintaining our margin. So that's one piece of work. We're very good at that."*

292.   The above statements made by Defendant Coburn during the J.P. Morgan Technology, Media and Telecom Conference were materially false and misleading when made. It was misleading for Coburn to tout Cognizant's ability to "constantly lower [clients'] cost of ownership while maintaining [the Company's] margin," when Cognizant's ability to deliver cost savings to its clients while maintaining its margin was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

293.   On August 5, 2016, Cognizant filed a Form 10-Q with the SEC. As noted above, this public filing was signed by D'Souza and McLoughlin. The Form 10-Q reported revenue for the three months ended June 30, 2016, of $3,369.9 million, an increase over second quarter 2015 revenue of $3,085.1 million. Cognizant's Q2 2016 Form 10-Q further stated that the *"key drivers of our revenue growth during the three months ended June 30, 2016" were: "[s]olid performance in our Manufacturing/Retail/Logistics and Other business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting and digital services";*

*"[c]ontinued expansion of the market for global delivery of IT and business process services"; and "[i]ncreased penetration at existing customers."*

294.   Cognizant's Q2 2016 Form 10-Q further reported: ***"Revenue from our Rest of World customers grew 25.0% . . . in the second quarter of 2016, and was primarily driven by the India***, Singapore and Australia markets."

295.   The above statements made in the Q2 2016 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and penetration of the Rest of World market, and India specifically, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

296.   On August 5, 2016, Cognizant held its Q2 2016 earnings conference call with analysts and investors. Defendant Coburn again emphasized Cognizant's ability to deliver cost savings to clients and attributed that ability to wholly legitimate elements of the Company's business model:

> *[T]he drive for getting continued efficiencies from existing IT infrastructure to be able to fund innovation projects remains absolutely essential to almost every client. . . . Our strong vertical presence and investments in building sharply focused industry-specific platforms allow clients to obtain these efficiencies by*

*shifting from buying a service to buying an outcome. These trends will continue to open opportunities for us over the coming years.*

297.   During the same call, McLoughlin attributed the Company's financial success *"to a slightly lower tax rate and stronger operating margins."*

298.   The above statements, made by Coburn and McLoughlin during the Q2 2016 earnings conference call, were materially false and misleading when made. It was misleading for Coburn to attribute Cognizant's ability to deliver costs savings to clients to wholly legitimate business factors and conditions, including the Company's "strong vertical presence and investments in building sharply focused industry-specific platforms," when, in fact, the Company's ability to deliver cost savings to its clients was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

299.   Similarly, it was misleading for McLoughlin to attribute Cognizant's financial performance to legitimate business factors and conditions, including "a slightly lower tax rate and stronger operating margins," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

300.   Analysts reacted favorably to these statements. On August 5, 2016, Evercore ISI published an analyst report stating: "Meanwhile Rest of World revenue advanced 25% led by Singapore, India, and Australia."

301.   Also on August 5, 2016, Religãre published a report stating: "Overall, [Cognizant]'s earnings have grown faster than Indian IT."

302.   On that same day, William Blair published a report stating: "Revenue: From a geographic point of view, significant growth in the rest of the world was driven by Singapore, India, and Australia, while North America grew 8.3% year-over-year, and Europe grew 8.9% year-over-year."

303.   Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions thereto, Cognizant's stock price increased from an opening price of $58.22 per share on August 4, 2016, to a closing price of $59.71 per share on August 5, 2016, an increase of approximately 2.5%.

304.   On September 6, 2016, Defendant Coburn attended the Citi Global Technology Conference with analysts and investors. During the conference, Coburn stated:

> In the core business, it is becoming more difficult in the clients' eyes to differentiate yourself. When I say core business, traditional, application, maintenance. There, it is fairly easy though to have a conversation with a client if you don't care about the rate card, you care about the cost of ownership. So let's move away from time and materials pricing to output-based pricing. ***I will reduce your cost of ownership, because I'm going to bring in automation, I'm going to bring in various tools of productivity, go more offshore whatever, pull the different levers, clients are very open to that discussion.***
>
> ***And we've been very successful at, while maintaining our margins, being able to achieve the cost of ownership that the clients want.***

305.   The above statements made by Defendant Coburn during the Citi Global Technology Conference were materially false and misleading when made. It was misleading for Coburn to tout Cognizant's ability to "reduce your cost of ownership" through "various tools of productivity," such as "automation" and "offshore" operations, when, in fact, the Company's ability to deliver cost savings to its clients, while maintaining margins, was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials. It also was misleading for Coburn to tout Cognizant's "success[]" at cutting clients' IT costs "while maintaining our margins" for the same reason.

**E.     The SEC Action Settlement**

306.   On February 15, 2019, the SEC instituted cease-and-desist proceedings pursuant to Section 21C of the Exchange Act against Cognizant, pursuant to which the SEC accepted an Offer of Settlement from the Company (the "SEC Settlement").

307.   The SEC Settlement stated the following concerning Cognizant's violation of the Foreign Corrupt Practices Act of 1977 (the "FCPA"):

> Cognizant paid bribes to an Indian government official to induce that official to direct that a permit be issued to facilitate the completion of a construction project. Cognizant made use of the means and instrumentalities of interstate commerce by hosting video conferences at which American executives participated in formulating the scheme and by exchanging email messages to and from the United States to approve the concealing of the payment. Two U.S. senior executives at

Cognizant took active steps to advance the scheme, and Cognizant is liable for their conduct by *respondeat superior*. As a result, Cognizant violated Exchange Act Section 30A.

308.   Further, the SEC Settlement noted that:

Cognizant violated Section 13(b)(2)(B) by failing to devise and maintain a sufficient system of internal accounting controls at its corporate headquarters and at Cognizant India. Cognizant's system for handling contractor change orders in India permitted managers to conceal bribe payments through the manipulation of bogus construction charges. The company's procurement process did not include an effective review of the disbursement of funds for change orders. Nor did it include an effective review of the application or renewal of facility permits and licenses. Cognizant also did not adequately enforce its corporate policy against making improper payments to government officials. And it failed to provide reasonable assurances that its Indian subsidiary maintained accurate and complete records of transactions involving payments to government officials.

309.   In connection with the SEC Settlement, the Company agreed to "pay disgorgement of $16,394,351, prejudgment interest of $2,773,017, and a civil monetary penalty of $6,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3)."

310.   Upon information and belief, none of the Individual Defendants contributed to the monetary penalties paid by the Company.

**F.     The Securities Class Action Motion to Dismiss is Denied**

311.   On June 5, 2020 the court in the Securities Class Action issued an order denying defendants' motion to dismiss, finding that lead plaintiff had met the

burden to adequately plead securities fraud claims under Section 10(b), Rule 10b-5, and Section 20(a) against defendants.

312.   In its opinion, the court noted, *inter alia*, that: (i) statements touting the benefits of Cognizant's SEZ licenses remain actionable at the pleading stage; (ii) and that alleged financial misstatements concerning Cognizant's financial earnings were sufficiently material at the pleading stage.

## VIII.  DAMAGES TO COGNIZANT

313.   As a result of the Individual Defendants' wrongful conduct, Cognizant disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Cognizant's credibility. Cognizant has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

314.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Cognizant's market capitalization has been substantially damaged, having lost millions of dollars in value as a result of the conduct described herein.

315.   Further, as a direct and proximate result of the Individual Defendants' conduct, Cognizant has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending Cognizant and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b) costs incurred from defending the DOJ Action and the SEC Action;

(c) costs incurred in connection with the $25 million SEC Settlement;

(d) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Cognizant's artificially inflated stock price; and

316. Moreover, these actions have irreparably damaged Cognizant's corporate image and goodwill. For at least the foreseeable future, Cognizant will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Cognizant's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

317.   Plaintiff brings this action derivatively in the right and for the benefit of Cognizant to redress injuries suffered, and to be suffered, by Cognizant as a direct result of the violations asserted herein by the Defendants.   Cognizant is named as a Nominal Defendant solely in a derivative capacity.   This is not a

collusive action to confer jurisdiction on this Court that it would not otherwise have.

318.   Plaintiff has continuously held Cognizant shares since the beginning of the Relevant Period and remains a shareholder of the Company to this date.

319.   Plaintiff will adequately and fairly represent the interests of Cognizant in enforcing and prosecuting his rights.

320.   As detailed below, Plaintiff's pre-suit demand has been refused by the Board, forcing Plaintiff to file this shareholder derivative action, and this Complaint, on behalf of the Company.

321.   Plaintiff has not made any demand on the shareholders of Cognizant to institute this action since such demand would be a futile and useless act for the following reasons:

(a) Cognizant is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

(b) making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Cognizant shareholders; and

(c) making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty

322.   The Director Defendants breached their fiduciary duties of care, loyalty, and good faith by rejecting Plaintiff's Demand without adequate consideration and without conducting a proper investigation. The Board had an affirmative duty under Delaware law to conduct a reasonable, objective, and good faith investigation into the allegations set forth in the Demand, and to determine on the basis of that investigation whether the Demand's factual allegations and legal claims had merit and whether pursuing the claims in litigation would be in the Company's best interests.

323.   Boards that fulfill their duty to investigate a shareholder's litigation demand reasonably, objectively, and in good faith, and to act reasonably on the basis of the investigation, retain the protections of the business judgment rule's presumption that they acted independently, on a reasonably informed basis, and in good faith. Boards that fail to do so may not avail themselves of this presumption, and the shareholder's litigation demand will be deemed to have been wrongfully refused.

324.   The Board's decision to reject the Demand was not a decision made independently on the basis of reasonable conclusions drawn in good faith from the findings of a reasonable, independent, and good faith investigation.

325.   Given the Board's wrongful, bad-faith, and unreasonable refusal of Plaintiffs' lawful demands to sufficiently investigate the misconduct, and/or to take

sufficient action to remedy the harms caused to the Company, this shareholder derivative action should be permitted to proceed.

326.   On March 27, 2019, Mahalingam Sudarsan issued the Sudarsan Demand on the Board to investigate, and if warranted, commence an action against certain current and/or former directors and executive officers of the Company for violations of Delaware law. A true and correct copy of the Sudarsan Demand is attached hereto as **Exhibit A**.[80]

327.   Thereafter, Sudarsan's counsel received a letter, dated April 17, 2019, from Rachel G. Skaistis ("Skaistis"), counsel for Cognizant, indicating receipt of the Sudarsan Demand and noting that in March 2017 the Board formed a Special Demand Review Committee (the "Special Committee") to investigate similar allegations raised by a different shareholder (the "Carder Demand"). A true and correct copy of the April 17, 2019 letter is attached hereto as **Exhibit B**.

328.   On June 13, 2019, Sudarsan's counsel received another letter from Skaistis. A true and correct copy of the June 13, 2019 letter is attached hereto as **Exhibit C**.   The June 13, 2019 letter noted that "each of the allegations in the Sudarsan Demand . . . has been previously investigated by the Special Committee, with the assistance of Cravath" in connection with the Carder Demand.  The June 13, 2019 letter noted that the Special Committee unanimously concluded that:

---

[80] As stated above, Sudarsan will no longer pursue the Demand, which will instead by pursued by Plaintiff in this Action.

(i) the work done to date, including the prior work carried out in connection with the Carder Demand, has provided a sufficient basis on which to evaluate and respond to the demands made in the Sudarsan Demand, and that incurring additional investigative expense is neither necessary nor in the best interest of Cognizant and its stockholders; (ii) after considering the relevant factors, including the merit and impact to the Company of any potential legal claims, bringing litigation in connection with the matters raised in the Sudarsan Demand would not be in the best interests of Cognizant and its stockholders; and (iii) the demands in the Sudarsan Demand for action by the Company should be rejected. The Special Committee then voted unanimously to adopt recommendations to the Board implementing those conclusions.

329.   The June 13, 2019 letter further stated that during a meeting on the Board on May 14, 2019, the Board was presented with the findings of the Special Committee and thereafter unanimously determined to reject the demands in the Sudarsan Demand.

330.   On July 3, 2019, Sudarsan's counsel e-mailed Skaistis requesting documents and other information related to the review of the Sudarsan Demand by the Special Committee, including, but not limited to a copy of the report relied upon by the Special Committee whereby it completed its review of the matters raised in the Carder Demand.

331.   On August 7, 2019, Sudarsan's counsel received a letter from Skaistis stating that "the June 13 letter described in detail the work the Committee performed in response to an earlier" demand and that "Cravath did not create a

written report for the Committee in connection with the Carder Demand. As a result, there is noting to provide . . . ."

332.   The refusal of the Sudarsan Demand is even more troubling in light of the recent Settlement with the SEC whereby Cognizant agreed to pay $25 million to settle charges that it violated the FCPA, and two of the company's former executives were charged for their roles in facilitating the payment of millions of dollars in a bribe to an Indian government official, as well as the denial of the motion to dismiss in the Securities Class Action.

333.   A majority of the Board who received the Sudarsan Demand were not independent and disinterested.  As detailed above, throughout the Relevant Period, Defendants repeatedly emphasized that the Company's SEZ facilities were a critical driver of its strong financial performance. At the same time, Defendants also assured the investing public that they had legitimately obtained the SEZ licenses, stating that Cognizant did not make any payments to government officials to obtain anything of value, and that the Company maintained a system of rigorous internal controls precisely to prevent such payments. This information concerning the true financial condition of the Company would have been discussed at meetings of the Board as well as committee meetings of the Board.  This provides additional evidence concerning the involvement of the Board in, and awareness of, matters directly underlying the fraudulent conduct alleged herein.

334.   Accordingly, a majority of the Board were aware or recklessly disregarded that Cognizant's representations to investors were materially false and misleading and omitted material information necessary to properly evaluate the Company and its financial condition and prospects, and therefore could not have independently considered the Sudarsan Demand.

## COUNT I

### Against the Individual Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

335.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

336.   As a result of the conduct and events alleged above, Cognizant has been named as a defendant in the Securities Class Action brought on behalf of Cognizant shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

337.   Federal law provides Cognizant with a cause of action against other alleged joint tortfeasors under Rule 10b-5.   In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Cognizant has a federal law right of contribution against joint tortfeasors under Rule 10b-5.   Section 21D(f) of the Securities and Exchange Act

further sets forth specific provisions entitling Cognizant to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Securities Class Action, and sets forth specific rules regarding the determination of claims for such contribution.

338.   Accordingly, Plaintiff, on behalf of Cognizant, hereby claims contribution against the Individual Defendants, each of whom has been named in the currently pending Securities Class Action as a joint tortfeasor with Cognizant under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Cognizant.

339.   Cognizant claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

## Allegations Regarding the Individual Defendants

340.   Throughout the Relevant Period, the Individual Defendants made or caused the Company to make false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects.   These statements were materially misleading to persons who purchased Cognizant securities during the Relevant Period.   As detailed above, throughout the Relevant Period, Defendants repeatedly emphasized that the Company's SEZ facilities were a critical driver of its strong financial performance. At the same time, Defendants also assured the investing

public that they had legitimately obtained the SEZ licenses, stating that Cognizant did not make any payments to government officials to obtain anything of value, and that the Company maintained a system of rigorous internal controls precisely to prevent such payments.

341.   The plaintiffs in the Securities Class Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Cognizant securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

342.   The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

343.   The plaintiffs in the Securities Class Action were unaware of the false and misleading nature of said statements and omissive disclosures.

344.   When the Individual Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Cognizant, the Individual Defendants

were privy to information regarding the Company's financial prospects and internal controls, and would have been well aware the ongoing issues at the Company.

345.   Accordingly, the Individual Defendants are liable for damages under Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Cognizant were to be held liable in the Securities Class Action, the Individual Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Cognizant.

**Allegations Regarding the Individual Defendants as Control Persons**

346.   In acting as alleged above, the Individual Defendants were acting as authorized agents of Cognizant in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

347.   The Individual Defendants were "controlling persons" of Cognizant within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Individual Defendants could be held liable to the plaintiffs in the Securities Class Action.  Were the Company to be held liable in said Securities Class Action, the Individual Defendants would be liable to it for contribution.

## COUNT II

### Against the Individual Defendants for Contribution and Indemnification

348.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

349.   Cognizant is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to Defendants' liability to the Company.

350.   The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of Defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against Cognizant, by virtue of the Individual Defendants' misconduct.

351.   For instance, in connection with the SEC Settlement for violation of the FCPA, the Company has expended $25 million in monetary penalties.

352.   Plaintiff hereby derivatively claims such right of contribution on behalf of Cognizant.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Cognizant and that Plaintiff is an adequate representative of the Company

B.      Determining and awarding to Cognizant the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.      Directing Cognizant to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Cognizant and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a provision to permit shareholders of Cognizant to nominate a majority of the candidates for election to the Board;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Cognizant's directors, executives, and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

D.    Awarding to Cognizant restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 14, 2020                    Respectfully submitted,

                                        **O'KELLY & ERNST, LLC**

                                        */s/ Ryan M. Ernst*
                                        Ryan M. Ernst, Esq. (#4788)
                                        824 N. Market Street, Suite 1001A
                                        Wilmington, DE 19801
                                        Phone (302) 778-4000
                                        Email: rernst@oelegal.com

                                        *Attorneys for Plaintiff*

**LIFSHITZ LAW FIRM, P.C.**
Joshua M. Lifshitz
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376